# EXHIBIT A

 **CT Corporation**

**Service of Process Transmittal**
08/17/2020
CT Log Number 538100721

TO: Paul Bech
Chubb
436 Walnut St
Philadelphia, PA 19106-3703

RE: **Process Served in Florida**

FOR: Illinois Union Insurance Company  (Domestic State: IL)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Star Title Partners of Palm Harbor, LLC, etc., Pltf. vs. Illinois Union Insurance Company, Dft. |
| **DOCUMENT(S) SERVED:** | Notice, Summons, Civil Cover Sheet, Complaint, Attachment(s) |
| **COURT/AGENCY:** | Pinellas County Circuit Court, FL<br>Case # 20003508CI |
| **NATURE OF ACTION:** | Insurance Litigation |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Electronic Receipt on 08/17/2020 |
| **JURISDICTION SERVED :** | Florida |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | Robert C. Hubbard<br>Vaka Law Group, P.L.<br>777 S. Harbour Island Blvd.<br>Suite 300<br>Tampa, FL 33602<br>813-549-1799 |
| **REMARKS:** | Process received by Chief Financial Officer on 07/31/2020, and forwarded to C T Corporation System by electronic delivery on 08/17/2020. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 08/17/2020, Expected Purge Date: 08/22/2020<br><br>Image SOP<br><br>Email Notification,  Incoming Legal  incominglegal@chubb.com |
| **SIGNED:**<br>**ADDRESS:** | C T Corporation System<br>155 Federal St Ste 700<br>Boston, MA 02110-1727 |
| **For Questions:** | 800-448-5350<br>MajorAccountTeam1@wolterskluwer.com |

Page 1 of  1 / JR

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.



*20-000240241*

CHIEF FINANCIAL OFFICER
JIMMY PATRONIS
STATE OF FLORIDA

STAR TITLE PARTNERS OF PALM HARBOR,
LLC, A FLORIDA LIMITED LIABILITY COMPANY

PLAINTIFF(S)

VS.

ILLINOIS UNION INSURANCE COMPANY

DEFENDANT(S)

_____/

SUMMONS, CIVIL COVER SHEET, COMPLAINT, EXHIBIT

| | |
|---|---|
| **CASE #:** | **20-003508-CI** |
| **COURT:** | **CIRCUIT COURT** |
| **COUNTY:** | **PINELLAS** |
| **DFS-SOP #:** | **20-000240241** |

# <u>NOTICE OF SERVICE OF PROCESS</u>

NOTICE IS HEREBY GIVEN of acceptance of Service of Process by the Chief Financial Officer of the State of Florida. Said  process was received in my office by PROCESS SERVER on Friday, July 31, 2020 and a copy was forwarded by ELECTRONIC DELIVERY on Monday, August 17, 2020 to the designated agent for the named entity as shown below.

      ILLINOIS UNION INSURANCE COMPANY
      DONNA MOCH
      1200 SOUTH PINE ISLAND ROAD
      PLANTATION, FL 33324

**\*Our office will only serve the initial process(Summons and Complaint) or Subpoena and is not responsible for transmittal of any subsequent filings, pleadings, or documents unless otherwise ordered by the Court pursuant to Florida Rules of Civil Procedure, Rule #1.080**

Jimmy Patronis
Chief Financial Officer

ROBERT HUBBARD
777 S. HARBOUR ISLAND BLVD., SUITE 300
TAMPA, FL 33602

AJ1

Case Number:20-003508-CI

Filing # 110845605 E-Filed 07/27/2020 02:49:04 PM



Date: 7/31/20
Time: 1045n
By: CMC  qas #101

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL DIVISION

STAR TITLE PARTNERS OF PALM
HARBOR, LLC, a Florida Limited
Liability Company,

       Case No.:

      Plaintiffs,

v.

ILLINOIS UNION INSURANCE
COMPANY,

      Defendant.

_____/    **SUMMONS**

THE STATE OF FLORIDA:
To Each Sheriff of the State:

GREETINGS:

     **YOU ARE COMMANDED** to serve this summons and a copy of the complaint in this lawsuit on defendant:

        **ILLINOIS UNION INSURANCE COMPANY**
          c/o  Florida Chief Financial Officer as RA
          200 East Gaines Street
          Tallahassee, FL  32399-4201

**DATED** on  JUL 27 2020 _____ , 2020.

    (Court Seal)

                  **KEN BURKE, CPA**
                  As Clerk of the Court

                  By _____
                  As Deputy Clerk
                  315 Court Street
                  Clearwater, FL 33756



RECEIVED AS STATUTORY REGISTERED AGENT on 31 July, 2020 and served on defendant or named party on 17 August, 2020 by the Florida Department of Financial Services

**\*If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the ADA Coordinator, 400 S. Fort Harrison Avenue, 5th Floor, Clearwater, Florida 33756, (727) 464-4880, at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call TRS at 711.**

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached complaint with the clerk of this court. A phone call will not protect you. Your written response, including the case number given above and the names of the parties, must be filed if you want the court to hear your side of the case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

## IMPORTANTE

Usted ha sido demandado legalmente. Tiene 20 dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal. Una llamada telefonica no lo protegera. Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas. Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecu-tifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal. Un simple coup de telephone est insuffisant pour vous proteger. Vous etes obliges de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom

des parties nommees ici, si vous souhaitez que le tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egale-ment, en meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

**George A. Vaka, Esquire**
Florida Bar No.: 374016
**Robert C. Hubbard, Esquire**
Florida Bar No.: 98996
**VAKA LAW GROUP, P.L.**
777 S. Harbour Island Blvd., Ste. 300
Tampa, Florida 33602
Phone: (813) 549-1799
Fax:    (813) 549-1780
**Plaintiff's Attorneys**

Filing # 110845605 E-Filed 07/27/2020 02:49:04 PM

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.     CASE STYLE**

IN THE CIRCUIT COURT OF THE SIXTH   JUDICIAL CIRCUIT,
IN AND FOR PINELLAS   COUNTY, FLORIDA

Case No.: 20-003508-CI
Judge: _____

STAR TITLE PARTNERS OF PALM HARBOR, LLC, a Florida
Plaintiff
vs.
ILLINOIS UNION INSURANCE COMPANY
Defendant

**II.     AMOUNT OF CLAIM**
Please indicate the estimated amount of the claim rounded to the nearest dollar $190,000

**III.     TYPE OF CASE**     (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

| | |
|---|---|
| [ ] Condominium | [ ] Malpractice – other professional |
| [ ] Contracts and indebtedness | ☒ Other |
| [ ] Eminent domain | [ ] Antitrust/Trade Regulation |
| [ ] Auto negligence | [ ] Business Transaction |
| [ ] Negligence – other | [ ] Circuit Civil - Not Applicable |
|   [ ] Business governance | [ ] Constitutional challenge-statute or ordinance |
|   [ ] Business torts | [ ] Constitutional challenge-proposed amendment |
|   [ ] Environmental/Toxic tort | [ ] Corporate Trusts |
|   [ ] Third party indemnification | [ ] Discrimination-employment or other |
|   [ ] Construction defect | ☒ Insurance claims |
|   [ ] Mass tort | [ ] Intellectual property |
|   [ ] Negligent security | [ ] Libel/Slander |
|   [ ] Nursing home negligence | [ ] Shareholder derivative action |
|   [ ] Premises liability – commercial | [ ] Securities litigation |
|   [ ] Premises liability – residential | [ ] Trade secrets |
| [ ] Products liability | [ ] Trust litigation |
| [ ] Real Property/Mortgage foreclosure | |
|   [ ] Commercial foreclosure | [ ] County Civil |
|   [ ] Homestead residential foreclosure | [ ] Small Claims up to $8,000 |
|   [ ] Non-homestead residential foreclosure | [ ] Civil |
|   [ ] Other real property actions | [ ] Replevins |
| [ ] Professional malpractice | [ ] Evictions |
|   [ ] Malpractice – business | [ ] Other civil (non-monetary) |
|   [ ] Malpractice – medical | |

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

IV.   **REMEDIES SOUGHT** (check all that apply):
   ☒ Monetary;
   ☐ Non-monetary declaratory or injunctive relief;
   ☐ Punitive

V.   **NUMBER OF CAUSES OF ACTION:**
   (Specify)

   1 - Breach of Contract

VI.   **IS THIS CASE A CLASS ACTION LAWSUIT?**
   ☐ Yes
   ☒ No

VII.   **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
   ☒ No
   ☐ Yes – If "yes" list all related cases by name, case number and court:

VIII.   **IS JURY TRIAL DEMANDED IN COMPLAINT?**
   ☒ Yes
   ☐ No

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature:   s/ Robert C. Hubbard
   Attorney or party
FL Bar No.:  98996
   (Bar number, if attorney)
   Robert C. Hubbard
   (Type or print name)
   Date:   07/27/2020

Filing # 110845605 E-Filed 07/27/2020 02:49:04 PM

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL DIVISION

STAR TITLE PARTNERS OF PALM
HARBOR, LLC, a Florida Limited
Liability Company,

     Plaintiffs,

v.                                                    Case No.: 20-003508-CI

ILLINOIS   UNION   INSURANCE
COMPANY,

     Defendant.

_____/

## COMPLAINT

    Plaintiff, STAR TITLE PARTNERS OF PALM HARBOR, LLC ("Star Title Partners"), a Florida Limited Liability Company, sues Defendant, ILLINOIS UNION INSURANCE COMPANY, and states as follows:

### JURISDICTION AND VENUE

    1.    This is an action for damages in excess of $30,000 exclusive of interest, costs and attorney's fees.

    2.    Plaintiff has at all material times been a Florida limited liability company with it principal place of business in Pinellas County.

    3.    Defendant, ILLINOIS UNION INSURANCE COMPANY ("CHUBB"), is a foreign corporation authorized to conduct the business of insurance in Florida and which, at all times material hereto, conducted the business of insurance in Pinellas County, Florida.

    4.    Venue is proper in Pinellas County, Florida.

1

## GENERAL ALLEGATIONS

5.      Star Title Partners is a title company.

6.      CHUBB issued a Victor O. Schinnerer & Company Cyber Protection Package Policy to Star Title Partners with effective dates of April 4, 2019 to April 4, 2020 (the "Policy"). A complete copy of the Policy is attached hereto as **Exhibit "A."**

7.      The Policy includes a Cybercrime Endorsement, which provides coverage for Deceptive Transfer Fraud subject to a $250,000 limit of liability and a $25,000 retention.

8.      On August 1, 2019, the sellers signed an agreement confirming Star Title Partners as the settlement agent for the sale of their home.

9.      Star Title Partners then emailed Capital Mortgage Services of Texas and requested a payoff statement.

10.     Capital Mortgage Services of Texas is a mortgage company.

11.     On August 6, 2019, Star Title Partners received an email purportedly from a representative of Capital Mortgage Services of Texas.

12.     The email included a fraudulent payoff statement, which listed a Sun Trust Bank account as the recipient of the payoff funds.

13.     On August 9, 2019, Star Title Partners wired the payoff funds to the Sun Trust account listed in the fraudulent payoff statement.

14.     On or about October 23, 2019, Star Title Partners was alerted by the sellers that the funds were not received.

15.     Star Title Partners conducted an internal review and determined that the payoff statement was likely fraudulent.

16.     Star Title Partners immediately reported the incident to CHUBB.

2

17.     However, by letter dated December 24, 2019, CHUBB denied coverage based on the exclusion for claims resulting from "any person purporting to be a representative of any financial institution, asset manager, broker-dealer, armored motor vehicle company, or any similar entity." A copy of the Denial Letter is attached hereto as **Exhibit "B."**

18.     Due to CHUBB's denial of coverage, Star Title Partners had no choice but to pay the entire amount of the sellers' mortgage payoff to mitigate damages and avoid litigation.

## COUNT I – BREACH OF CONTRACT

19.     Plaintiff restates and incorporates by reference the allegations in paragraphs 1 through 19 as if fully set forth herein.

20.     The Policy issued by CHUBB specifically affords coverage for "Deceptive Transfer Fraud." The relevant insuring agreement provides as follows:

> **We** will pay for **Your** loss of **Funds** resulting directly from **Your** having transferred, paid or delivered any **Funds** from **Your Account** as the direct result of an intentional misleading of **Your** employee, through a misrepresentation of a material fact ("**Deceptive Transfer**") which is:
> 1. relied upon by an employee, and
> 2. sent via a telephone call, email, text, instant message, social media related communication, or any other electronic instruction, including a phishing, spearphishing, social engineering, pretexting, diversion, or other confidence scheme, and,
> 3. sent by a person purporting to be an employee, customer, client or vendor; and,
> 4. the authenticity of such transfer request is verified in accordance with **Your** internal procedures.
> if such loss is discovered during the **Policy Period** and noticed to **Us** as set forth in this endorsement.

21.     As described in the general allegations, Star Title Partners suffered a loss of funds as a result of a "Deceptive Transfer" as defined in the relevant insuring agreement.

22.     The Deceptive Transfer was (1) relied upon by an employee, (2) sent via an email social engineering scheme, and (3) sent by a person purporting to be an employee, customer, client

or vendor; and (4) the authenticity of the transfer request was verified in accordance with Star Title Partner's internal procedures.

23.     Therefore, the facts and circumstances trigger the Deceptive Transfer Fraud insuring agreement, and there is no applicable exclusion.

24.     Nevertheless, CHUBB abandoned its insured and wrongfully denied coverage— thereby breaching the insurance policy.

25.     Star Title Partners has satisfied all conditions precedent to bringing this action or, in the alternative, such conditions have been waived by CHUBB.

26.     As a result of the breach of contract by CHUBB, Star Title Partners was damaged in that it was required to pay the full amount of the sellers' mortgage payoff along with interest to mitigate the damages.

WHEREFORE, Plaintiff, Star Title Partners, demands judgment for compensatory damages against CHUBB, requests an award of pre- and post-judgment interest, attorneys' fees pursuant to §§626.9373, Fla. Stat. or 627.428, Fla. Stat., and costs, as well as any other relief that the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff, Star Title Partners, demands a trial by jury on all issues so triable.

DATED this 27th day of July, 2020.

Respectfully submitted,

_/s/ Robert C. Hubbard_
**George A. Vaka, Esquire**
Florida Bar No.: 374016
gvaka@vakalaw.com
**Robert C. Hubbard, Esquire**
Florida Bar No.: 98996
rhubbard@vakalaw.com

4

**VAKA LAW GROUP, P.L.**
777 S. Harbour Island Blvd., Suite 300
Tampa, Florida 33602
Phone: (813) 549-1799
Fax:     (813) 549-1780
Secondary e-mail:
kpeterson@vakalaw.com
lstolinas@vakalaw.com
*Attorneys for Plaintiff*

# Exhibit A

 Illinois Union Insurance Company
525 W. Monroe Street
Chicago, IL 60661

**Victor O. Schinnerer & Company
Cyber Protection Package**

This Policy is issued by the stock insurance company listed above.

THIS POLICY IS A CLAIMS MADE AND REPORTED POLICY.  EXCEPT AS OTHERWISE PROVIDED HEREIN, THIS POLICY COVERS ONLY CLAIMS FIRST MADE AGAINST THE INSUREDS AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD.  PLEASE READ THIS POLICY CAREFULLY.

THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED DAMAGES SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIMS EXPENSES.  FURTHER NOTE THAT AMOUNTS INCURRED FOR DAMAGES AND CLAIMS EXPENSES SHALL ALSO BE APPLIED AGAINST THE RETENTION AMOUNT.

TERMS THAT APPEAR IN BOLD FACE TYPE HAVE SPECIAL MEANING.  PLEASE REFER TO SECTION XVIII, "DEFINITIONS" OF THE COVERAGE FORM.

THIS INSURANCE IS ISSUED PURSUANT TO THE FLORIDA SURPLUS LINES LAW. PERSONS INSURED BY SURPLUS LINES CARRIERS DO NOT HAVE THE PROTECTION OF THE FLORIDA INSURANCE GUARANTY ACT TO THE EXTENT OF ANY RIGHT OF RECOVERY FOR THE OBLIGATION OF AN INSOLVENT UNLICENSED INSURER.

Policy No.  G28930392003

| | | |
|---|---|---|
| Item 1. **Named Insured:** | Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | |
| Mailing Address: | 30522  US 19 North, Suite #101  Palm Harbor FL 34684 | |
| Item 2.  Producer Information: | All Risks Ltd.<br>3 Independence Way<br>Princeton, NJ 08540 | |
| Item 3. **Policy Period:** | From: 04/04/2019          To: 04/04/2020<br>at 12:01 a.m. (local time at the address stated in Item 1.) | |
| Item 4.  Description of Business and Legal Status | | |
| Business Description: | Professional, Scientific, and Technical Services | |
| Legal Status: | LLC | |
| Item 5.  Limit of Liability (including **Claims Expenses**) | | |
| $1,000,000 | Each **Claim** | |
| $1,000,000 | Maximum **Policy** Aggregate Limit of liability | |
| Item 6.  Retention | | |
| $15,000 | Each **Claim** | |
| Item 7.  Premium | | |
| $1,586.00 | | |
| Item 8.  **Retroactive Date** (if applicable):  04/04/2017 | | |

Item 9.  Notice to **Us**:

A.  Notice of **Claim, Digital Property Replacement, Network Security Failure** or **Cyber Extortion Threat**:

Professional Risk
P.O. Box 5105
Scranton, PA 18505-0518

ChubbClaimsFirstNotice@chubb.com

1-800-433-0385
1-800-523-9254 (after hours)

Fax Number: 877-201-8787

B.  In the event of a **Claim** (or potential **Claim**), where urgent crisis management support is required, please contact:

**Data Breach Coach** Hotline: 1 (844) 739-7754

C.  All other notices:

Chief Underwriting Officer
Victor O. Schinnerer & Co, Inc.
Two Wisconsin Circle
Chevy Chase, MD 20815

Item 10.  Optional **Extended Reporting Period**:

| | |
|---|---|
| Additional Premium: | $1,189.50 |
| Additional Period: | 1 Year |

Item 11.  Endorsements Attached To This Policy At Inception:

| | |
|---|---|
| MS-221030 (06/18) | Internet Media Liability |
| LD-5S23j (03/14) | Surplus Lines Signature Endorsement |
| PF-46280 (08/15) | Business Interruption Coverage Endorsement (Terrorism Coverage Elected) |
| PF-46363 (08/15) | Payment Card Sublimit Endorsement |
| PF-46365 (06/15) | Regulatory Proceeding Sublimit |
| PF-46393 (06/15) | Cybercrime Endorsement |
| PF-272957 (02/19) | Other Insurance Amended - Primary Insurance for Data Breach Team Expenses (02/19) |

IN WITNESS WHEREOF, **We** have caused this **Policy** to be countersigned by a duly authorized representative.

Countersigned: _____   by _____
                        Date                          JOHN J. LUPICA, President
                                                   Authorized Representative

SURPLUS LINES AGENT: Chris B. McGovern
LIC # E043040
10150 York Road, 5th Floor
Hunt Valley, MD 21030
PROD. AGT.____Paul M Bondy_____
Street ___23114 Expedition Drive_____
City_____Ashburn_____ Zip ___20148____
This insurance is issued pursuant to the Florida
Surplus Lines Laws. Persons insured by Surplus
Lines carriers do not have the protection of the
Florida Insurance Guaranty Act to the extent of
any right of recovery for the obligation of an
insolvent unlicensed insurer.
Quarter_____2ND 2019_____
Premium___$1,586.00_____ Tax _$81.05____
Agents Countersignature _____

| | |
|---|---|
| Policy Fee: | $35.00 |
| Inspection Fee: | N/A |
| FL SL Tax: | $81.05 |
| FSLSO Service Fee: | $1.62 |
| Hurricane Cat. Fund: | |
| Citizens Assess Fee: | N/A |
| EMPA Surcharge: | N/A |
| Total Payable at Inception : | $1,703.67 |

# FLORIDA POLICYHOLDER NOTICE

**LAW AND ORDINACE COVERAGE IS AN IMPORTANT COVERAGE THAT YOU MAY WISH TO PURCHASE. YOU MAY ALSO NEED TO CONSIDER THE PURCHASE OF FLOOD INSURANCE FROM THE NATIONAL FLOOD INSURANCE PROGRAM. WITHOUT THIS COVERAGE, YOU MAY HAVE UNCOVERED LOSSES. PLEASE DISCUSS THESE COVERAGES WITH YOUR INSURANCE AGENT.**

**SURPLUS LINES INSURERS' POLICY RATES AND FORMS ARE NOT APPROVED BY ANY FLORIDA REGULATORY AGENCY.**

ONE OR MORE OF THE FOLLOWING MAY APPLY TO YOUR POLICY:

A

**THIS POLICY CONTAINS A SEPARATE DEDUCTIBLE FOR HURRICANE OR WIND LOSSES, WHICH MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU.**

B

**THIS POLICY CONTAINS A CO-PAY PROVISION THAT MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU.**

C

**THIS POLICY MAY EXCLUDE WIND THAT MAY RESULT IN HIGH OUT-OF-POCKET EXPENSES TO YOU.**

PLEASE REVIEW YOUR POLICY CAREFULLY AND CONTACT YOUR LICENSED AGENT IF YOU HAVE ANY QUESTIONS.

CHUBB

# U.S. Treasury Department' Office Of Foreign Assets Control ("FAC") Advisory Notice to Policyholders

This Policyholder Notice shall not be construed as part of your policy and no coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. Please read this Notice carefully.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

PF-17914 2/05 Reprinted, in part, with permission of ISO Properties, Inc. Page 1 of 1



**ACE Producer Compensation**
**Practices & Policies**

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our website at http://www.aceproducercompensation.com or by calling the following toll-free telephone number: 1-866-512-2862.

**CHUBB**°

Illinois Union Insurance Company

**Victor O. Schinnerer & Company
Cyber Protection Package**

**Quick Reference**

|                                         | BEGINNING ON PAGE |
| --------------------------------------- | :---------------: |
| AGREEMENT                               | 2                 |
| COVERAGE                                | 2                 |
| DEFENSE                                 | 3                 |
| EXCLUSIONS                              | 3                 |
| EXTENDED REPORTING PERIODS              | 5                 |
| LIMITS OF LIABILITY                     | 6                 |
| RETENTION                               | 6                 |
| NOTICE                                  | 6                 |
| OTHER INSURANCE                         | 7                 |
| MATERIAL CHANGES IN CONDITIONS          | 7                 |
| REPRESENTATIONS                         | 8                 |
| TERMINATION OF THE POLICY               | 8                 |
| TERRITORY AND VALUATION                 | 8                 |
| SUBROGATION                             | 9                 |
| ACTION AGAINST US AND BANKRUPTCY        | 9                 |
| AUTHORIZATION CLAUSE                    | 9                 |
| ALTERATION, ASSIGNMENT AND HEADINGS     | 9                 |
| ALTERNATIVE DISPUTE RESOLUTION          | 9                 |
| DEFINITIONS                             | 9                 |

# IMPORTANT NOTICE

In the event of a **Claim** (or potential **Claim**), where urgent crisis management support is required,
please contact the **Data Breach Coach** Hotline: 1-844-739-7754

CHUBB

**Victor O. Schinnerer & Company**

Illinois Union Insurance Company

**Cyber Protection Package**

Wherever, used in this **Policy**, the Declarations, and endorsements:  1) **We, Us**, and **Our** mean the insurance company which issued this policy; and 2) **You, Your**, and **Insured** mean the entity named in Item 1 of the declarations page.

**You** and **Us** are also referred to individually as "Party", and collectively, as the "Parties".

In consideration of the payment of the premium, in reliance upon the **Application**, and subject to the Declarations and the terms and conditions of this **Policy, We** agree with **You** as follows:

I.    COVERAGE

Coverage provided under this **Policy** is for **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs**, and **Digital Property Replacement** on account of any **Claim** taking place, brought or maintained anywhere in the world subject to the terms and conditions of this **Policy**.

1.    **We** will pay for the following:

    A.    **Data Breach Expenses** (as defined below) incurred by **You** in excess of **Your** Retention if, during the **Policy Period**,  an **Insured** or a **Service Provider** discover a **Data Breach** taking place after the **Retroactive Date. We** will pay the following reasonable and necessary **Data Breach Team Expenses** in excess of **Your** Retention when **You** exclusively use the **Data Breach Team**:

    **Data Breach Expenses** means the following reasonable and necessary expenses:

      i.    Costs for services of a **Data Breach Coach**, including but not limited to their services for **Regulatory Communications**;

      ii.    Forensic services to determine the cause and scope of a **Data Breach** to which this **Policy** may apply, including a **Data Breach** regarding the confidentiality or security of **Personal Information** or **Third Party Corporate Information**;

      iii.    Costs to comply with **Privacy Regulations** including but not limited to retaining the services of a law firm to determine necessary actions, engage in **Regulatory Communications**, and draft notification letters;

      iv.    Costs to notify **Breached Persons** as required by statute or regulation, including call center services;

      v.    Costs to voluntarily notify **Breached Persons**, subject to **You** receiving **Our** prior written consent or **You** receiving direction from the **Data Breach Coach**;

      vi.    Costs for public relations or crisis communications assistance to protect and restore **Your** reputation as the result of a **Data Breach** involving the confidentiality or security of **Personal Information** or **Third Party Corporate Information**;

      vii.    Costs for a legal review of **Your** contract with a **Service Provider** to analyze **Your** indemnification rights if the **Data Breach** resulted from  the **Service Provider's** act, error, or omission;

      viii.    Costs for credit monitoring, fraud consultation, credit freezing, fraud alert service expenses, and identity restoration services **You** offer to a **Breached Person,** subject to **You** receiving **Our** prior written consent or **You** receiving direction from the **Data Breach Coach**.

    In the event of a **Data Breach**, contact the **Data Breach Coach** as indicated on the Declarations, and provide notice to **Us** as set forth in Section VII, Notice.

    B.    **Digital Property Replacement**, including **Network Security Failure Investigation Expenses**, incurred by **You** in excess of **Your** Retention if, during the **Policy Period, You** have a **Network Security Failure**,

    C.    **Cyber Extortion Costs** you incur in excess of **Your** Retention if, during the **Policy Period, You** receive a **Cyber Extortion Threat**.

2.    If, during the **Policy Period,** there is a **Claim** first made or brought against **You** based on a **Data Breach, Network Security Failure,** or unintentional violation of **Your** privacy policy, or violation of any **Privacy Regulation,** including the unintentional wrongful collection of **Personal Information** by **You,** taking place on or after the **Retroactive Date, We** will defend **You** and pay, in excess of **Your** retention. **Your Claims Expenses** and **Damages**.

II.   DEFENSE

**We** have the right and duty to defend any covered **Claim** brought against **You** even if such **Claim** is groundless, false or fraudulent. **You** shall not

1.   admit or assume liability without **Our** prior written consent;

2.   settle or negotiate any **Claim** unless such settlement fully resolves such **Claim** within the applicable Retention; or

3.   incur any **Claims Expenses**, certain **Data Breach Team Expenses, Cyber Extortion Costs,** or **Digital Property Replacement** without Our prior written consent.

**We** have the right to appoint counsel and to make such investigation and defense of a covered **Claim** as **We** deem necessary.

**We** have the right, but not the duty, to defend any **Regulatory Proceeding.** For **Regulatory Proceeding Claims, You** will select defense counsel from **Our** list of approved law firms, and **We** reserve the right to associate in the defense.

We will not settle any **Claim** without **Your** written consent. If **You** refuse to consent to a settlement or a compromise that **We** recommend and the claimant would accept, then **Our** Limit of Liability will be reduced to (i) the amount of **Damages** for which the **Claim** could have been settled plus all **Claims Expenses** incurred up to the time **We** made **Our** recommendation to **You**, plus (ii) 50% of all subsequent covered **Claims Expenses** in excess of such amount referenced in (i), the remaining 50% of which shall be borne by **You**, uninsured, and at **Your** own risk, which amount shall not exceed that portion of any applicable Aggregate Limit of Liability that remains unexhausted by payment of **Damages, Claims Expenses, Data Breach Expenses, Cyber Extortion Costs** and **Digital Property Replacement,** or by any combination thereof. However, this subsection does not apply to any potential settlement that is within the Retention.

**We** are not obligated to investigate, defend, pay or settle, or continue to investigate, defend, pay or settle any **Claim** after any applicable Limit of Liability specified in Item 5 of the Declarations has been exhausted by payment of **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs** or **Digital Property Replacement** or by any combination thereof, or after **We** have deposited the remainder of any unexhausted applicable Limit of Liability into a court of competent jurisdiction. In either such case, **We** shall have the right to withdraw from the further investigation, defense, payment or settlement of such **Claim** by tendering control of such **Claim** to **You.**

**You** shall cooperate with **Us**, and provide **Us** with all information and assistance which **We** reasonably request including, but not limited to, attending hearings, depositions and trials and assistance in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and conducting the defense of any **Claim** covered by this **Policy. You** shall do nothing that may prejudice **Our** position. **You** shall immediately forward to **Us**, at the address indicated in Item 9 of the Declarations, every demand, notice, summons, or other process or pleading **You** or **Your** representatives receive.

III.   EXCLUSIONS

We will not pay for **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs,** or **Digital Property Replacement** on account of any **Claim** (i) alleging, based upon, arising out of or attributable to directly or indirectly resulting from, in consequence of, or in any way involving; or (ii) brought or maintained by, on behalf of, or in the right of:

1.   Any:

A.   dishonest, fraudulent, criminal, malicious or intentional act, error or omission, or any intentional or knowing violation of the law by an **Insured**; or

B.   gaining in fact of any profit, remuneration or financial advantage to which an **Insured** was not legally entitled.

However, only facts known by the **Control Group** will be imputed to other **Insureds**. In addition, **We** will still defend the **Insured**  and pay **Claims Expenses** until there is a judgment against, binding arbitration against, adverse admission by, finding of fact against, or plea of *nolo contendere* or no contest by the **Insured**, at which time the **Insured** shall reimburse **Us** for any **Claims Expenses** we have paid.

2.   Any **Bodily Injury** or **Property Damage**, unless the claim is for mental injury, mental anguish, mental tension, emotional distress, pain and suffering, or shock resulting from a covered **Data Breach.**

3.  A breach of any express, implied, actual or constructive contract, warranty, guarantee, or promise, including any actual or alleged liability assumed by an **Insured**, unless such liability would have attached to the **Insured** even in the absence of such contract, warranty, guarantee, or promise, or the contract obligated the **Insured** to maintain the confidentiality or security of **Personal Information** or **Third Party Corporate Information** and there has been a **Data Breach**. This exclusion shall not apply to that part of a **Claim** for **Payment Card Loss**.

4.  Any **Insured**, or any other natural person or entity for whom or which **You** are legally liable. However, this exclusion shall not apply to a **Claim** against **You** resulting from a covered **Data Breach** or **Network Security Failure.**

5.  Any illegal discrimination of any kind, or any humiliation, harassment or misconduct based upon, arising out of or related to any such discrimination, or any **Wrongful Employment Practices**. However, this exclusion shall not apply to that part of any **Claim** alleging employment-related invasion of privacy or employment-related wrongful infliction of emotional distress in the event such **Claim** arises out of the loss of **Personal Information** resulting from a **Data Breach.**

6.  Any price fixing, restraint of trade, monopolization, unfair trade practices or other violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, or any other federal statutory provision involving antitrust, monopoly, price fixing, price discrimination, predatory pricing or restraint of trade activities, and any amendments thereto or any rules or regulations promulgated thereunder or in connection with such statutes, or any similar provision of any federal, state, or local statutory law or common law anywhere in the world. However, this exclusion shall not apply to a **Data Breach** resulting in a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to alleged or actual violations of unfair or deceptive acts or practices in or affecting commerce pursuant to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

7.  Any violation of the Employee Retirement Income Security Act of 1974, the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisors Act, or any other federal, state or local securities law, or any rules or regulations promulgated thereunder, amendments thereof, or any similar federal, state or common law.

8.  Any act, error, omission, event, or incident actually or allegedly committed prior to the beginning of the **Policy Period** if, on or before the earlier of the effective date of this **Policy** or the effective date of any **Policy** issued by the **Insurer** of which this **Policy** is a continuous renewal or a replacement, a member of the **Control Group** knew that the act, error, omission, event or incident did or could lead to a **Claim.**

9.  Any prior or pending litigation, **Claims**, demands, arbitration, administrative or regulatory proceeding or investigation filed or commenced on or before the earlier of the effective date of this **Policy** or the effective date of any policy issued by the **Insurer** of which this **Policy** is a continuous renewal or a replacement, or which has been the subject of any written notice given under any other policy before the earlier of the effective date of this **Policy** or the effective date of any policy issued by the **Insurer** of which this **Policy** is a continuous renewal or a replacement, or alleging or derived from the same or substantially the same fact, circumstance or situation underlying or alleged therein; or any other act, error, omission, event, or incident which, together with the underlying allegations would constitute an **Interrelated Act.**

10. Any (i) electrical or mechanical failures or interruption, including but not limited to any electrical disturbance, surge, spike, brownout or blackout, and outages to gas, water, telephone, cable, satellite, telecommunications or other infrastructure, or (ii) failure, interruption, or outage to **Internet** access service provided by the **Internet** service provider that hosts the **Your Website**, unless such infrastructure is under **Your** operational control. This exclusion shall not apply to failures, interruptions, disturbances or outages of telephone, cable or telecommunications infrastructure under **Your** operational control which result directly from a covered **Data Breach** or **Network Security Failure.**

11. Fire, smoke, explosion, lightning, wind, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, act of God or nature or any other physical event, however caused.

12. War, kinetic military action, invasion, acts of foreign enemies, terrorism, hijacking, hostilities or warlike operations (whether war is declared or not), military or usurped power, civil commotion assuming the proportions of or amounting to an uprising, strike, lock-out, riot, civil war, rebellion, revolution, or insurrection. However, this exclusion shall not apply to an Act of Cyber-Terrorism that results in a Claim.

13. False, deceptive or unfair business practices or any violation of consumer protection laws. However, this exclusion shall not apply to a **Regulatory Proceeding** or **Consumer Redress Fund** for that portion of **Damages** or **Claims Expenses** allocated to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), for alleged violations of unfair or deceptive acts or practices in or affecting commerce.

14. Any validity, invalidity, infringement, violation or misappropriation of any copyright, service mark, trade name, trademark, patent, **Trade Secret**, or other intellectual property of any third party.

15. Any unsolicited electronic dissemination of faxes, e-mails or other communications by an **Insured** or on the **Insured's** behalf to multiple actual or prospective customers of the **Insured** or any other third party, including but not limited to actions brought under the Telephone Consumer Protection Act, any federal or state anti-spam statutes, and/or any other federal or state statute, law or regulation relating to a person's or entity's right of seclusion, unless such dissemination results from a **Data Breach**, in which case this exclusion shall not apply.

16. Any unauthorized, surreptitious, or wrongful collection of **Personal Information** by the **Insured** or the failure to provide adequate notice that such information is being collected. However, this exclusion shall not apply solely to the unintentional violation of **Your** privacy policy that results in the violation of any **Privacy Regulation**, including but not limited to the unintentional wrongful collection of **Personal Information** by **You**. Furthermore, only facts known by the **Control Group** will be imputed to other **Insureds**.

17. For the rendering of or failure to render professional services by **You** or an **Insured** to others or any fees, expenses, or costs paid to or charged by **You** or an **Insured**.

18. For chargeback fees, interchange fees or rates, transfer fees, transaction fees, discount fees, merchant service fees, prospective service fees, or chargebacks.

19. Solely with respect to **Digital Property Replacement** coverage, any transmission of unauthorized, corrupting or harmful software code, distributed attacks, viruses, worms or malware which is self-propagating.

20. Solely with respect to **Digital Property Replacement** coverage, any operator error, software error, faulty instruction, unintentional programming error, or failure in project planning.

21. Solely with respect to **Digital Property Replacement** coverage, any accounts, bills, evidences of debt, money, valuable papers, records, abstracts, deeds, manuscripts or other documents, except as they have been converted to data processing media form, and then only in that form.

IV. **EXTENDED REPORTING PERIODS**

1. If **We** terminate or do not renew this **Policy** (other than for failure to pay a premium when due), or if **You** terminate or do not renew this **Policy** and do not obtain replacement coverage as of the effective date of such termination or nonrenewal, **You** shall have the right, upon payment of the additional premium described below, to a continuation of the coverage granted by this **Policy** for at least one **Extended Reporting Period** as set forth below. The Automatic and Optional **Extended Reporting Periods** shall be part of and not in addition to the Limit of Liability for the immediately preceding **Policy Period**. The Automatic and Optional **Extended Reporting Periods** shall not increase or reinstate the Limit of Liability, which shall be **Our** maximum liability for the **Policy Period** and the Automatic and Optional **Extended Reporting Period**, combined. A change in **Policy** terms, conditions, exclusions and/or premiums shall not be considered a nonrenewal for purposes of triggering the rights to the Automatic or Optional **Extended Reporting Period**.

2. **Extended Reporting Period** Options:

   A. Automatic **Extended Reporting Period**

   **You** shall have continued coverage granted by this **Policy** for a period of 60 days following the effective date of such termination or nonrenewal, but only for **Claims** first made during such 60 days and arising from a **Data Breach, Network Security Failure, or Cyber Extortion Threat**, taking place prior to the effective date of such termination or nonrenewal. This Automatic **Extended Reporting Period** shall immediately expire upon **Your** purchase of replacement coverage.

   B. Optional **Extended Reporting Period**

   **You** shall have the right, upon payment of the additional premium set forth in Item 10 of the Declarations, to an Optional **Extended Reporting Period**, for the period set forth in Item 10 of the Declarations following the effective date of such termination or nonrenewal, but only for **Claims** first made during such Optional **Extended Reporting Period** and arising from a **Data Breach, Network Security Failure**, or **Cyber Extortion Threat** taking place prior to the effective date of such termination or nonrenewal. This right to continue coverage shall lapse unless written notice of such election is given by **You** to **Us**, and **We** receive payment of the additional premium within 60 days following the effective date of termination or nonrenewal. The first 60 days of the Optional **Extended Reporting Period**, if it becomes effective, shall run concurrently with the Automatic **Extended Reporting Period**. **We** shall give **You** notice of the

premium due for the Optional **Extended Reporting Period** as soon as practicable following the date **You** give such notice of such election, and such premium shall be paid by **You** to **Us** within 10 days following the date of such notice by **Us** of the premium due. The Optional **Extended Reporting Period** is not cancelable and the entire premium for the Optional **Extended Reporting Period** shall be deemed fully earned and non-refundable upon payment.

V.  LIMITS OF LIABILITY

Regardless of the number of **Insureds** against whom **Claims** are brought, **Claims** made or persons or entities making **Claims**:

1. The Each **Claim** Limit of Liability stated in the Declarations is **Our** maximum liability for the sum of all **Damages**, all **Claims Expenses**, all **Data Breach Team Expenses**, all **Cyber Extortion Costs** and all **Digital Property Replacement** because of each **Claim**, including each **Claim** alleging any **Interrelated Act**, first made and reported during the **Policy Period**.

2. The Aggregate Limit of Liability stated in the Declarations is **Our** maximum liability under the applicable Insuring Agreement for the sum of all **Damages**, all **Claims Expenses**, all **Data Breach Team Expenses**, all **Cyber Extortion Costs**, and all **Digital Property Replacement** because of all **Claims** combined in the aggregate, including all **Claims** alleging any **Interrelated Act**, first made and reported during the **Policy Period**. If the Limit of Liability is exhausted by payment of **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs,** or **Digital Property Replacement, Our** obligations under this **Policy** shall be completely fulfilled and extinguished.

3. All **Claims** arising out of the same **Data Breach, Network Security Failure,** or **Cyber Extortion Threat,** and all **Interrelated Acts** of **You** and the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

4. **All Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs, and Digital Property Replacement** resulting from a single **Claim** shall be deemed, respectively, **Claims Expense, Data Breach Expense, Cyber Extortion Cost** or **Digital Property Replacement** and shall be part of and not in addition to the applicable Aggregate Limits of Liability stated in the Declarations, and shall reduce such Aggregate Limits of Liability. If the Limit of Liability is exhausted by payment of **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs, or Digital Property Replacement,** then **Our** obligations under this **Policy** shall be completely fulfilled and extinguished. **We** are entitled to pay **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs, and Digital Property Replacement** as they become due and payable by **You**, without consideration of other future payment obligations.

VI.  RETENTION

**Our** liability shall apply only to that part of **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs** and **Digital Property Replacement** which are in excess of the applicable Retention amount shown in the Declarations. Such Retention shall be borne uninsured by **You** and at the risk of all **Insureds**. A single Retention amount shall apply to **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs,** and **Digital Property Replacement** arising from all **Claims** alleging **Interrelated Acts**.

VII.  NOTICE

1. Any member of the **Control Group** shall, as a condition precedent to **Your** rights under this **Policy**, give **Us** written notice of any **Claim** as soon as practicable, but in no event later than 30 days after the latest of the end of the **Policy Period**, the Automatic **Extended Reporting Period**, or, if elected, the Optional **Extended Reporting Period**.

2. If, during the **Policy Period**, any member of the **Control Group** becomes aware of any specific event involving a **Data Breach, a Network Security Failure,** or an act, error, or omission which may reasonably give rise to a future **Claim** covered under this **Policy**, and if such **Control Group** member gives written notice to **Us** during the **Policy Period**, the Automatic **Extended Reporting Period**, or, if elected, the Optional **Extended Reporting Period** of:

   A. the identity of the potential claimants;

   B. a description of the anticipated allegations;

   C. the identity of the **Insureds** allegedly involved;

   D. the circumstances by which the **Insureds** first became aware of the specific event;

   E. the consequences which have resulted or may result; and

    F.   the nature of the potential monetary damages;

then any **Claim** which arises out of such specific event shall be deemed to have been first made at the time such written notice was received by **Us**. No coverage is provided for fees, expenses and other costs incurred prior to the time such specific event results in a **Claim**.

3.    All notices under any provision of this **Policy** shall be in writing and given by certified mail properly addressed to the appropriate party. Notice to **You** may be given at the address shown in Item 1 of the Declarations. Notice to **Us** of any **Claim** or any specific event involving a **Data Breach**, a **Network Security Failure**, or an act, error, or omission which may reasonably give rise to a future **Claim** covered under this **Policy** shall be given to **Us** at the address set forth in Item 9A of the Declarations. Urgent crisis management requests shall be submitted to **Us** at the hotline set forth in Item 9B of the Declarations. All other notices to **Us** under this **Policy** shall be given to the address set forth in Item 9C of the Declarations. Notice given as described above shall be deemed to be received and effective upon actual receipt thereof by the addressee, or one day following the date such notice is sent, whichever is earlier. Notice to any agent or knowledge possessed by any agent or by any other person shall not affect a waiver or a change in any part of this **Policy** nor prevent **Us** from asserting any right under the terms of this **Policy**.

4.    No notice that may be given during the **Policy Period** under subsection 2 above may be given during an elected **Extended Reporting Period**.

VIII.   OTHER INSURANCE

If any **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs** or **Digital Property Replacement**, covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall cover such **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs,** or **Digital Property Replacement** subject to the **Policy** terms and conditions, only to the extent that the amount of such **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs,** or **Digital Property Replacement** are in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**.

IX.   MATERIAL CHANGES IN CONDITIONS

1.    Acquisition or Creation of Another Organization, Or Acquisition By Another Entity

If, during the **Policy Period**, **You**:

A.   acquire voting securities in another organization or create another organization, which as a result of such acquisition or creation becomes a **Subsidiary** or acquire any organization by merger into or consolidation with **You**, then, subject to the terms and conditions of this **Policy**, such organization shall be covered under this **Policy** but only with respect to **Claims** for acts, errors, omissions, events, or incidents, taking place after such acquisition or creation, unless **We** have agreed to provide coverage by endorsement for such acts, errors, omissions, events, or incidents, taking place prior to such acquisition or creation. Furthermore, if the total assets of such acquired organization, as reflected in the then most recent consolidated financial statements of the organization, exceeds 20% of **Your** total revenue and the revenue of the **Subsidiaries** as reflected in **Your** then-most-recent consolidated financial statements, **You** shall, as a condition precedent to coverage with respect to such **Insureds**, no later than 60 days after the effective date of such acquisition or creation:

   i.   give written notice of such acquisition or creation to **Us**;

   ii.   pay any additional premium **We** require; and

   iii.  agree to any additional terms and conditions of this **Policy** as **We** require.

B.   or substantially all of **Your** assets, are acquired by another entity; or if **You** merge or consolidate into or are acquired with another entity such that **You** are not the surviving entity or if any person, entity or affiliated group of persons or entities obtains the right to elect, appoint or designate at least 50% of **Your** directors, then coverage under this **Policy** will continue in full force and effect until termination of this **Policy**, but only with respect to **Claims** for **Data Breach, Network Security Failure, Cyber Extortion Threat,** or **Digital Property Replacement** that take place before such event. Coverage under this **Policy** will cease as of the effective date of such event with respect to **Claims** for **Data Breach, Network Security Failure, Cyber Extortion Threat,** or **Digital Property Replacement** taking place after such event. This **Policy** may not be cancelled after the effective time of the event, and the entire premium for this **Policy** shall be deemed earned as of such time.

2.    Termination of a **Subsidiary**

If before or during the **Policy Period** an organization ceases to be a **Subsidiary**, coverage with respect to the **Subsidiary** shall continue until termination of this **Policy**. Such coverage continuation shall apply only with respect to **Claims** for **Data Breach, Network Security Failure, Cyber Extortion Threat,** or **Digital Property Replacement** taking place prior to the date such organization ceased to be a **Subsidiary**.

X.    REPRESENTATIONS

**You** represent and acknowledge that the statements and information contained in the **Application**, including all information provided concerning network security policies and procedures, information management policies and procedures, and business continuity plans and policies, are true and accurate and form the basis of this **Policy**, and are to be considered as incorporated into and constituting a part of this **Policy**. Such statements and information shall be deemed material to the acceptance of this risk or the hazard **We** assume under this **Policy**. It is further understood and agreed that:

1.    this **Policy** is issued in reliance upon the truth and accuracy of such representations **You** have made to **Us**, including loss control audits and network security assessments as required by **Us;**

2.    if such representations or such information are not true, accurate and complete, this **Policy** shall be null and void in its entirety and **We** shall have no liability hereunder.

Solely with respect to the applicability of this Section X, Representations of the **Policy**, only facts pertaining to and knowledge possessed by the person(s) who signed the **Application** or member of the **Control Group** shall be imputed to other **Insureds.**

XI.    TERMINATION OF THE **POLICY**

1.    This **Policy** shall terminate at the earliest of the following times:

A.    the effective date of termination specified in a prior written notice by **You** to **Us;**

B.    30 days after receipt by **You** of a written notice of termination from **Us;**

C.    10 days after receipt by **You** of a written notice of termination from **Us** for failure to pay a premium when due, unless the premium is paid within such 10 day period;

D.    upon expiration of the **Policy Period** as set forth in Item 3 of the Declarations; or

E.    at such other time as may be agreed upon by **You** and **Us.**

2.    If **You** terminate the **Policy**, **We** shall refund the unearned premium computed at the customary short rate. If the **Policy** is terminated by **Us**, **We** shall refund the unearned premium computed *pro rata*. Payment or tender of any unearned premium by **Us** shall not be a condition precedent to the effectiveness of such termination, but such payment shall be made as soon as practicable.

3.    If **We** terminate the **Policy**, **We** will provide notice of termination to the **Named Insured**.

XII.    TERRITORY AND VALUATION

All premiums, limits, Retentions, **Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs** or **Digital Property Replacement** and other amounts under this **Policy** are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of loss under this **Policy** is stated in a currency other than United States of America dollars, payment under this **Policy** shall be made in United States dollars at the applicable rate of exchange as published in *The Wall Street Journal* as of the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of loss is due, respectively, or, if not published on such date, the next date of publication of *The Wall Street Journal*.

XIII.    SUBROGATION

In the event of any payment under this **Policy**, **We** shall be subrogated to the extent of such payment to all the rights of recovery any **Insured** has. **We** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable **Us** effectively to bring suit or otherwise pursue subrogation rights in any **Insured's** name.

XIV.    ACTION AGAINST US AND BANKRUPTCY

Except as provided in Section XVII, Alternative Dispute Resolution, no action shall lie against **Us**. No person or organization shall have any right under this **Policy** to join **Us** as a party to any action against any **Insured** to determine the liability of the **Insured** nor shall **We** be impleaded by any **Insured** or its legal representatives.

Bankruptcy or insolvency of any **Insured** or of the estate of any **Insured** shall not relieve **Us** of its obligations nor deprive **Us** of **Our** rights or defenses under this **Policy**.

XV.   AUTHORIZATION CLAUSE

By acceptance of this **Policy**, **You** agree to act on behalf of all **Insureds** with respect to the giving of notice of **Claim**, the giving or receiving of notice of termination or non-renewal, the payment of premiums, the receiving of any premiums that may become due under this **Policy**, the agreement to and acceptance of endorsements,

consenting to any settlement, exercising the right to the **Extended Reporting Period**, and the giving or receiving of any other notice provided for in this **Policy**, and all **Insureds** agree that **You** shall so act on their behalf.

XVI.   ALTERATION, ASSIGNMENT AND HEADINGS

1.      No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of **Ours**.

2.      The titles and headings to the various parts, sections, subsections and endorsements of the **Policy** are included solely for ease of reference and do not in any way limit, expand or otherwise affect the provisions of such parts, sections, subsections or endorsements.

XVII.   ALTERNATIVE DISPUTE RESOLUTION

The **Parties** agree to submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process set forth in this Section. Either Party may elect the type of ADR process discussed below; provided, however, **You** shall have the right to reject the choice of the type of ADR process **We** make at any time prior to its commencement, in which case **Your** choice of ADR process shall control. The two choices of ADR process are (1) non-binding **Mediation** administered by any **Mediation** facility to which the **Parties** mutually agree, in which the **Parties** shall try in good faith to settle the dispute by **Mediation** in accordance with the then-prevailing commercial **Mediation** rules of the **Mediation** facility; or (2) arbitration submitted to any arbitration facility to which the **Parties** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either **Mediation** or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, or insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of **Mediation**, either **Party** shall have the right to commence a judicial proceeding; provided, however, that no such judicial proceeding shall be commenced until at least 60 days after the date the **Mediation** shall be deemed concluded or terminated. In all events, each **Party** shall share equally the expenses of the ADR process. Either ADR process may be commenced in New York, New York or in the state indicated in Item 1 of the Declarations as **Your** principal address. **You** shall act on behalf of each and every **Insured** in connection with any ADR process under this Section.

XVIII.   DEFINITIONS

In this policy, certain words and phrases are defined as follows, and shall apply equally to the singular and plural forms of the respective words. When used in this **Policy**:

1.      **Act of Cyber-Terrorism** means any act, including force or violence, or the threat thereof expressly directed against a **Computer System** that is operated by **You**, by an individual or group(s) of individuals, whether acting alone, on behalf of or in connection with any organization(s) or government(s), to cause unauthorized access to, unauthorized use of, or a targeted denial of service attack or transmission of unauthorized, corrupting or harmful software code to a **Computer System** that is lease, owned, or operated by the **Insured**, for the purpose of furthering social, ideological, religious, economic or political objectives, intimidating or coercing a government or the civilian population thereof, or disrupting any segment of the economy.

2.      **Application** means all applications, including any attachments thereto, and all other information and materials **You** submit to **Us** in connection with **Our** underwriting of this **Policy**. All such applications, attachments, information and materials are deemed attached to and incorporated into this **Policy**.

3.      **Bodily Injury** means injury to the body, sickness, or disease, and death. **Bodily Injury** also means mental injury, mental anguish, mental tension, pain and suffering, or shock, resulting from injury to the body, sickness, disease or death of any person.

4.      **Breached Person** means an individual whose **Personal Information** is subject to a **Data Breach**.

5.      **Claim** means:

     A.  a written demand,  civil proceeding commenced by the service of a complaint or similar pleading, arbitration proceeding, or a **Regulatory Proceeding** against **You** for monetary or non-monetary damages or injunctive relief;

     B.  a written report by **You** to **Us** of a **Data Breach** or a **Network Security Failure;**

     C.  a written report by **You** to **Us** of a **Cyber Extortion Threat;**

     D.  a written report by **You** to **Us** of the alteration, corruption or destruction of **Digital Property** caused by a **Data Breach** or a **Network Security Failure.**

6.    **Claims Expenses** means reasonable and necessary attorneys' fees, expert witness fees and other fees and costs **We** incur, or that **You** incur with **Our** prior written consent, in the investigation and defense of a covered **Claim. Claims Expenses** also means reasonable and necessary premiums for any appeal bond, attachment bond or similar bond, provided **We** shall have no obligation to apply for or furnish such bond. **Claims Expenses** shall not include the wages, salaries, fees or costs of directors, officers or employees of any **Insured**.

7.    **Computer System** means computer hardware (including laptops and mobile devices), software, firmware, and the data stored thereon, as well as associated input and output devices, data storage devices, networking equipment and Storage Area Network or other electronic data backup facilities.

8.    **Consumer Redress Fund** means the sum of money which **You** become legally obligated to deposit in a **Consumer Redress Fund** pursuant to Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), for alleged violations of unfair or deceptive acts or practices in or affecting commerce, where such money is equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** resulting from a **Data Breach** or **Network Security Failure.** However, the **Consumer Redress Fund** shall not include any sums paid which constitute taxes, fines, penalties, injunctions or sanctions.

9.    **Control Group** means **Your** Chief Executive Officer, Chief Financial Officer, Chief Information Officer, General Counsel, or Risk Manager, or the organizational or functional equivalent of such positions, and their respective direct reports

10.    **Cyber Extortion Costs** means **Your** payment of money with **Our** prior written consent that directly results from a **Cyber Extortion Threat**, including **Your** payment of money to a person or persons reasonably believed to be responsible for a **Cyber Extortion Threat** for the purpose of terminating that **Cyber Extortion Threat**.

11.    **Cyber Extortion Threat** means any credible threat or series of related threats directed at the **Insured** to:

     A.  release, divulge, disseminate, destroy or use the confidential information of a third party taken from the **Insured** as a result of the unauthorized access to or unauthorized use of the **Insured's Computer System**; or

     B.  cause a failure of **Network Security**.

12.    **Damages** means compensatory damages, any award of prejudgment or post-judgment interest, and settlements which **You** become legally obligated to pay on account of any **Claim** first made against **You** during the **Policy Period** or, if elected, the **Extended Reporting Period**, for a **Data Breach** or **Network Security Failure** to which this **Policy** applies. **Damages** shall also include **Regulatory Fines**, a **Consumer Redress Fund**, and **Payment Card Loss.**

**Damages** shall not include:

     A.  any amount that **You** are not financially liable or legally obligated to pay;

     B.  taxes, fines (except **Regulatory Fines** as noted below), penalties, or sanctions imposed against **You**;

     C.  matters uninsurable under the laws pursuant to which this **Policy** is construed;

     D.  punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to **You, Us,** this **Policy** or the **Claim** giving rise to such damages;

     E.  the cost to comply with any injunctive, remedial, preventative, or other non-monetary or declaratory relief, including specific performance, or any agreement to provide such relief;

F.  loss of fees or profits by **You**, return of fees, commissions or royalties by **You**, or re-performance of services by **You** or under **Your** supervision;

G.  disgorgement of any profit, remuneration or financial advantage to which **You** were not legally entitled;

H.  **Data Breach Team Expenses** or any other forensic, notification, crisis management or credit monitoring expenses, unless such expenses constitute a direct settlement of a **Regulatory Proceeding** or compensatory damages of a direct settlement with a **Breached Person**;

I.  liquidated damages pursuant to a contract, unless, even in the absence of such contract, **You** would be liable for such damages as result of a **Data Breach**;

J.  penalties of any nature, however denominated, arising by contract;

K.  any amount associated with the **Insured's** non-compliance with **Payment Card Industry Data Security Standards**, EMV specifications, or a mobile payment services merchant agreement between **You** and a payment services provider, unless such amount constitutes a **Payment Card Loss**; or

L.  any amounts other than those which compensate solely for a covered loss caused by a **Data Breach** or **Network Security Failure**.

13.  **Data Breach** means an **Insured's** failure to properly handle, manage, store, destroy or otherwise control **Personal Information**. Solely with respect to Coverage Part 1(A)(ii) and 1(A)(vi) and Coverage Part 2, **Data Breach** shall also mean an **Insured's** failure to properly handle, manage, store, destroy or otherwise control **Third Party Corporate Information**.

14.  **Data Breach Coach** means the law firm within the **Data Breach Team** designated for consultative and pre-litigation legal services provided to the **Insured**.

15.  **Data Breach Team** means approved service providers available at the Victor O. Schinnerer & Company eRisk Hub® website who provide legal, computer forensic, notification, call center, public relations, crisis communications, fraud consultation, credit monitoring, and identity restoration advice and services. **We** have no obligation to provide any of the legal, computer forensic, notification, call center, public relations, crisis communications, fraud consultation, credit monitoring, and identity restoration advice and services.

We shall not be a party to any agreement an **Insured** enters into with any **Data Breach Team** service provider. It is understood that **Data Breach Team** service providers are independent contractors, and are not **Our** agents. The **Insureds** agree that **We** assume no liability arising out of any services rendered by a **Data Breach Team** service provider. **We** shall not be entitled to any rights or subject to any obligations or liabilities set forth in any agreement entered into between any **Data Breach Team** service provider and an **Insured**. Any rights and obligations with respect to such agreement, including but not limited to billings, fees and services rendered, are solely for the benefit of, and borne solely by such **Data Breach Team** service provider and **You**.

16.  **Data Breach Team Expenses** means those reasonable and necessary expenses **We** incur or which the **Insured** becomes legally obligated to pay as set forth at Section I, Coverage, Subsection 1.A. **Data Breach Team Expenses** shall not include:

A.  costs or expenses incurred to update or otherwise improve privacy or network security controls, policies or procedures to a level beyond that which existed prior to the loss event or to be compliant with **Privacy Regulations**;

B.  taxes, fines, penalties, injunctions, or sanctions;

C.  legal, computer forensic, notification, call center, public relations, crisis communications, fraud consultation, credit monitoring, or identity restoration advice or services provided by individuals or entities that are not on the **Data Breach Team**; or

D.  wages, salaries, internal operating costs or expenses, or fees of the **Insured**.

17.  **Digital Property** means software and data in electronic form which is stored on the **Your Computer System**. **Digital Property** shall include the capacity of the **Your Computer System** to store information, process information, and broadcast information over the **Internet**.

18.  **Digital Property Replacement** means those reasonable and necessary costs incurred to replace, restore, or re-collect **Digital Property** from written records or from partially or fully matching electronic data records due to their alteration, corruption or destruction caused by a **Network Security Failure**.

This shall include **Network Security Failure Investigation Expenses**; however, in the event that the **Digital Property** cannot be replaced, restored or re-collected, **Digital Property Replacement** shall be limited to the reasonable and necessary costs incurred to reach this determination.

**Digital Property Replacement** does not include:

A. costs or expenses incurred to update, replace, restore, or otherwise improve **Digital Property** to a level beyond that which existed prior to the loss event;

B. costs or expenses incurred to identify or remediate software program errors or vulnerabilities, or costs to update, restore, replace, upgrade, update, maintain, or improve any **Computer System**;

C. costs incurred to research and develop **Digital Property**, including **Trade Secrets**;

D. the economic or market value of **Digital Property**, including **Trade Secrets**;

E. costs or expenses incurred due to ordinary wear and tear or gradual deterioration of **Digital Property**, including any data processing media; or

F. any other consequential loss or damage.

19. **Extended Reporting Period** means the period(s) for the extension of coverage, if applicable, described in Section IV, **Extended Reporting Periods.**

20. **Insured** means:

A. **You;**

B. **Your Subsidiaries**, but only with respect to **Claims** to which this **Policy** applies which occur while they are a **Subsidiary;**

C. any past, present or future principal, partner, officer, director, trustee, employee, leased employee or temporary employee of **Yours** or **Your Subsidiary**, but only with respect to acts, errors, or omissions committed within the scope of such person's duties performed on behalf of **You** or **Your Subsidiary;** and

D. independent contractors of **Yours** or of a **Subsidiary**, but only with respect to the commission of acts, errors or omissions within the scope of such person's duties performed on behalf of **You** or **Your Subsidiary.**

**Insured** also means the estates, heirs, legal representatives, assigns, spouses and domestic partners under the provisions of any applicable federal, state or local law or under the provisions of any formal program established by **You**, but only for a **Claim** arising solely out of their status as such and, in the case of a spouse or domestic partner, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the **Insured** to the spouse or domestic partner.

21. **Internet** means the worldwide public network of computers which enables the transmission of electronic data and which includes intranets, extranets and virtual private networks.

22. **Interrelated Acts** means all acts, errors, omissions, events, incidents, facts, circumstances or situations resulting in a **Data Breach, Network Security Failure**, or **Cyber Extortion Threat** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

23. **Mediation** means a non-binding process in which a neutral panel or individual assists the parties in reaching a settlement agreement. To be considered **Mediation** under this **Policy**, the process must be as set forth in the Commercial Mediation Rules of the American Arbitration Association, or such other process as **We** may, at **Our** sole option, approve.

24. **Named Insured** means the organization or natural person first specified in Item 1 of the Declarations.

25. **Network Security** means those activities **You** perform, or performed by others on behalf of the **Insured**, to protect against unauthorized access to, unauthorized use of, a denial of service attack by a third party directed against, or transmission of unauthorized, corrupting or harmful software code to, **Your Computer System.**

26. **Network Security Failure** means a failure in **Network Security**.

27. **Payment Card** means an authorized account, or evidence of an account, for a credit card, debit card, charge card, fleet card or stored value card between a payment card brand (including, but not limited to Visa, Inc., MasterCard Incorporated, Discover Financial Services, American Express Company or JCB Company, Ltd.) and its customer.

28. **Network Security Failure Investigation Expenses** means disaster recovery or computer forensic investigation efforts to determine the scope of a **Network Security Failure**.

29. **Payment Card Industry Data Security Standard** means the rules, regulations, standards or guidelines adopted or required by the Payment Card Brand or the Payment Card Industry Data Security Standards Council relating to data security and the safeguarding, disclosure and handling of **Personal Information.**

30. **Payment Card Loss** means monetary assessments, fines, penalties, chargebacks, reimbursements, and fraud recoveries which **You** become legally obligated to pay as a result of **Your** actual or alleged failure:

    A. of **Network Security**; or

    B. to properly handle, manage, store, destroy or otherwise control **Personal Information**,

    where such amount is determined pursuant to a payment card processing agreement between **You** and a payment card brand, a mobile payment services merchant agreement between **You** and a payment services provider, or demanded in writing from an issuing or acquiring bank that processes **Your Payment Card** transactions, due to **Your** actual or alleged non-compliance with the **Payment Card Industry Data Security Standards**, EMV specifications, or mobile payment security requirements.

    **Payment Card Loss** shall not include subsequent fines or assessments for continued noncompliance with the **Payment Card Industry Data Security Standard,** EMV Specifications, or a mobile payment services merchant agreement. **Payment Card Loss** also shall not include costs or expenses incurred to update or otherwise improve privacy or network security controls, policies or procedures to a level beyond that which existed prior to the loss event or to be compliant with **Payment Card Industry Data Security Standards,** EMV Specifications, or a mobile payment services merchant agreement.

31. **Personal Information** means:

    A. an individual's name, email address, social security number, medical or healthcare data, other protected health information, driver's license number, state identification number, credit card number, debit card number, address, unpublished telephone number, account number, account histories, or passwords; and

    B. other nonpublic, personal information as defined in **Privacy Regulations**;

    in any format if such information creates the potential for an individual to be uniquely and reliably identified or contacted.

32. **Policy** means, collectively, the Declarations, **Application**, this policy form and any endorsements.

33. **Policy Period** means the period of time specified in Item 3 of the Declarations, subject to prior termination pursuant to Section XI, Termination of the **Policy.**

34. **Privacy Regulations** means the following federal, state, local, or foreign laws, statutes and regulations associated with the control and use of personally identifiable financial, medical or other sensitive information:

    A. Health Insurance Portability and Accountability Act of 1996 (Public Law 104-191) and Health Information Technology for Economic and Clinical Health Act;

    B. Gramm-Leach-Bliley Act of 1999;

    C. the California Security Breach Notification Act (CA SB 1386) and Massachusetts 201 CMR 17;

    D. Identity Theft Red Flags under the Fair and Accurate Credit Transactions Act of 2003;

    E. Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), but solely for alleged violations of unfair or deceptive acts or practices in or affecting commerce;

    F. Data Protection Act 1998 or similar legislation to comply with the European Union Data Protection Directive 95/46/EC of 1995; and

    G. other similar local, state, federal, and foreign identity theft and privacy protection legislation similar to subparagraphs A, B, C, D, E, and F of this definition that requires commercial entities that collect **Personal Information** to post privacy policies, adopt specific privacy or security controls, or notify individuals in the event that **Personal Information** has potentially been compromised.

35. **Property Damage** means:

    A. physical injury to, or loss or destruction of, tangible property, including the loss of use thereof; and

    B. loss of use of tangible property which has not been physically injured, lost, damaged or destroyed.

    However, **Property Damage** does not mean physical injury to, loss or destruction of, or loss of use of intangible property, including data.

36. **Regulatory Communications** means a **Data Breach Team** law firm communicating with a government agency to comply with **Privacy Regulations,** responding to a request for information or demand by a governmental agency alleging the violation of **Privacy Regulations** as a result of a **Data Breach,**

37. **Regulatory Fines** means any civil monetary fine or penalty imposed by a federal, state, local or foreign governmental entity in such entity's regulatory or official capacity pursuant to its order under a **Regulatory Proceeding. Regulatory Fines** shall not include any civil monetary fines or penalties that are not insurable by law, criminal fines, disgorgement of profits, or multiple damages.

38. **Regulatory Proceeding** means a suit, civil investigation or civil proceeding by or on behalf of a government agency, commenced by a service of a complaint or similar pleading against **You** and alleging the violation of **Privacy Regulations** as a result of a **Data Breach** which may reasonably be expected to give rise to a covered **Claim** under this **Policy.**

39. **Retroactive Date** means the date specified in Item 8 of the Declarations for the applicable Insuring Agreement.

40. **Service Provider** means a third party vendor, contractor, or subcontractor performing on **Your** behalf and for which **You** are legally responsible

41. **Subsidiary** means a company that is partly or completely owned by another company that holds a controlling interest in the subsidiary company;

42. **Third Party Corporate Information** means third party corporate information in any format provided to **You** that is not available to the public, required by **You** to be kept confidential, and has been specifically identified as confidential and protected under a nondisclosure agreement or similar contract with **You.**

43. **Trade Secret** means information, including a formula, pattern, compilation, program, device, method, technique or process, that derives independent economic value, actual or potential, from not being generally known to or readily ascertainable by other persons who can obtain value from its disclosure or use, so long as reasonable efforts have been made to maintain its secrecy.

44. **Website** means the software, content and other materials accessible via the **Internet** at a designated Uniform Resource Locator address.

45. **Wrongful Employment Practices** means any actual or alleged wrongful dismissal or discharge or termination of employment, whether actual or constructive; employment-related misrepresentation; violation of any federal, state, or local laws (whether common or statutory) concerning employment or discrimination in employment; discrimination, sexual harassment, workplace harassment or violation of a natural person's civil rights relating to such discrimination or harassment, whether direct, indirect, intentional or unintentional; wrongful deprivation of a career opportunity or failure to employ or promote; wrongful discipline of employees; retaliation against employees for the exercise of any legally protected right or for engaging in any legally protected activity; negligent evaluation of employees; failure to adopt adequate workplace or employment policies and procedures; employment-related libel, slander, or defamation; employment-related invasion of privacy, except with respect to that part of any **Claim** arising out of the loss of **Personal Information** which is otherwise covered under this **Policy;** employment-related wrongful infliction of emotional distress, except with respect to that part of any **Claim** arising out of the loss of **Personal Information** which is otherwise covered under this **Policy.**

46. **Your Computer System** means a **Computer System** that is leased, owned, or operated by **You**; or operated solely for **Your** benefit by a third party service provider under written contract with **You.**

CHUBB

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured | | Endorsement Number |
|---|---|---|
| Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | | 1 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| EON | G28930392003 | 04/04/2019 to 04/04/2020 | 04/04/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

#### This endorsement modifies insurance provided under the following:

### VICTOR O. SCHINNERER & COMPANY CYBER PROTECTION PACKAGE

It is agreed that the **Policy** is amended as follows:

1.  The Declarations is amended as follows:

    a.  Item 5, Limit of Liability is deleted in its entirety and replaced with the following:

    Item 5.  Limit of Liability (including **Claims Expenses**)

    $500,000     Each **Claim** for First Party Cyber Coverage

    $1,000,000  Each **Claim** for Cyber, Privacy and **Network Security** Liability

    $500,000     Each **Claim** for **Internet Media** Liability

    $1,000,000  Maximum **Policy** Aggregate Limit of Liability

    b.  Item 6, Retention is deleted in its entirety and replaced with the following:

    Item 6.  Retention

    $15,000     Each **Claim** for First Party Cyber Coverage

    $15,000     Each **Claim** for Cyber, Privacy and **Network Security** Liability

    $15,000     Each **Claim** for **Internet Media** Liability

2.  Section I, Coverage, is amended as follows:

    a.  Subsection 1 is amended by adding the following title at the beginning thereof:

    1.  First Party Cyber Coverage

    b.  Subsection 2 is amended by adding the following title at the beginning thereof:

    2.  Cyber, Privacy and **Network Security** Liability

    c.  The following subsection is added:

    •  Internet Media Liability

    If, during the **Policy Period,** there is a **Claim** first made or brought against an **You** based on an error, misstatement, misleading statement, act, omission, neglect, breach of duty, or **Personal Injury** offense, actually or allegedly committed or attempted by any **Insured,** in their capacity as such, resulting in:

    a.  product disparagement, trade libel, infliction of emotional distress, mental anguish, outrage or outrageous conduct;

    b.  false light, public disclosure of private facts, or the intrusion and commercial appropriation of a name, persona or likeness;

    c.  plagiarism, piracy (excluding patent infringement), or the misappropriation or unauthorized use of advertising ideas, advertising material, titles, literary or artistic formats, styles or performances;

        d.  the infringement of copyright, domain name, trademark, trade name, trade dress, title or slogan, service mark, or service name; or

        e.  negligence with respect to **Your** creation or dissemination of **Internet Content,**

solely in the course of **Your Internet Media** activities, taking place on or after the **Retroactive Date, We** will defend the **You** and pay, in excess of **Your** retention, **Your Claims Expenses** and **Damages.**

3.  Section III, Exclusions, is amended as follows:

    a.  Solely with respect to the Internet Media Liability coverage afforded by this endorsement, Exclusion 14 is deleted in its entirety and replaced with the following:

       14. any validity, invalidity, infringement, violation or misappropriation of any patent or **Trade Secret** by **You** or on **Your** behalf.

    b.  Solely with respect to the Internet Media Liability coverage afforded by this endorsement, the following exclusions are added:

- the Federal Trade Commission, the Federal Communications Commission, or any other federal, state, or local government agency or ASCAP, SESAC, BMI or other licensing or rights organizations in such entity's regulatory, quasi-regulatory, or official capacity, function or duty.

- any inaccurate, inadequate, or incomplete description of the price of goods, products or services, disclosure of fees, representations with respect to the authenticity of any product, or the failure of any goods, product or services to conform with advertised quality or performance.

- any gambling, contest, game of chance or skill, lottery, or promotional game, including tickets or coupons or over-redemption related thereto.

4.  Solely with respect to Internet Media Liability coverage, Section XVIII, Definitions, is amended as follows:

    a.  Definition 22, **Interrelated Acts**, is deleted in its entirety and replaced with the following:

       22. **Interrelated Acts** means all acts, errors, omissions, events, incidents, facts, circumstances or situations resulting in a **Data Breach, Network Security Failure, Cyber Extortion Threat,** or **Media Incident,** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

    b.  The following definitions are added:

- **Advertising** means promotional material (including branding, co-branding, sponsorships and endorsements), publicly disseminated on **Your Website** on **Your** behalf.

- **Internet Content** means any data, text, sounds, images or similar matter disseminated electronically on **Your Website,** including but not limited to **Advertising. Internet Content** shall not include the actual goods, products or services described, illustrated or displayed on **Your Website.**

- **Internet Media** means the electronic publishing, dissemination, releasing, gathering, transmission, production, webcasting, or other distribution of (1) **Internet Content** on the **Internet** on **Your** behalf or by **You;** or (2) **Social Media Content** on a **Social Media Website** but only if distributed by or on behalf of **You.**

- **Personal Injury** offense means injury arising out of one or more of the following:

    1.  false arrest, detention or imprisonment;

    2.  malicious prosecution;

    3.  libel, slander, or other defamatory or disparaging material;

    4.  publication or an utterance in violation of an individual's right to privacy; and

    5.  wrongful entry or eviction, or other invasion of the right to private occupancy.

- **Social Media Content** means any data, text, sounds, images or similar matter disseminated electronically by **You** on a **Social Media Website. Social Media Content** shall not include:

  - any content that has not been pre-approved by **Your** legal department or communications department; and

  - the actual, goods, products or services described, illustrated or displayed in **Social Media**

Content.

- **Social Media Website** means a third party **Internet Website** for the purpose of allowing the creation and exchange of user-generated content through blogs, microblogs, social networking, and wiki's, including but not limited to Facebook, Twitter, LinkedIn, YouTube, Wikipedia, and Google+.

5. Solely with respect to Internet Media Liability coverage, Section V, Limits of Liability, paragraph 3, is deleted in its entirety and replaced with the following:

3. All **Claims** arising out of the same **Data Breach, Network Security Failure, Cyber Extortion Threat**, or **Internet Media**, and all **Interrelated Acts** of **You** and the **Insureds** shall be deemed to be one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made, regardless of whether such date is before or during the **Policy Period**.

All other terms and conditions of the policy remain unchanged.

•

_____
Authorized Representative

## CHUBB℠

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured<br>Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | | | Endorsement Number<br>2 |
|---|---|---|---|
| Policy Symbol<br>EON | Policy Number<br>G28930392003 | Policy Period<br>04/04/2019 to 04/04/2020 | Effective Date of Endorsement<br>04/04/2019 |
| Issued By (Name of Insurance Company)<br>Illinois Union Insurance Company | | | |

### Signature Endorsement

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**ILLINOIS UNION INSURANCE COMPANY** (A stock company)
525 W. Monroe Street, Suite 400, Chicago, Illinois 60661

**WESTCHESTER SURPLUS LINES INSURANCE COMPANY** (A stock company)
Royal Centre Two, 11575 Great Oaks Way, Suite 200, Alpharetta, GA 30022

REBECCA L. COLLINS, Secretary

JOHN J. LUPICA, President

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative

# CHUBB℠

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured | Endorsement Number |
|---|---|
| Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | 3 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| EON | G28930392003 | 04/04/2019 to 04/04/2020 | 04/04/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

### Business Interruption Coverage Endorsement (Terrorism Coverage Elected)
#### This endorsement modifies insurance provided under the following:
#### Victor O. Schinnerer & Company Cyber Protection Package

It is agreed that the **Policy** is amended as follows:

1. The Declarations are amended as follows:

    a.  Item 5, Limit of Liability, is amended by adding the following:

| | Each **Claim** | Aggregate |
|---|---|---|
| Business Interruption Coverage | $1,000,000 | $1,000,000 |

    b.  Item 6, Retention, is amended by adding the following:

        $15,000        each **Claim**

    c.  The following section is added:

        Additional Insuring Agreements:

        ☒ Business Interruption Coverage

    d.  The following is added:

        Item 12. **Waiting Period** 12 hours

2. Section I, Coverage, is amended by adding the following:

    I.  Business Interruption Coverage

        If, during the **Policy Period**, there is a **Claim** first made or brought against **You**, **We** will pay the **Income Loss** and **Extra Expense,** which includes disaster recovery or computer forensic investigation efforts,  incurred by **You** during the **Period of Restoration** resulting directly from a **Claim** reported to **You** which occurs during the **Policy Period**.

3. Section II, Defense, is amended by deleting the phrase "**Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs** or **Digital Property Replacement**" wherever it appears and replacing it with the phrase ""**Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs, Digital Property Replacement, Income Loss,** or **Extra Expense**"

4. Section III, Exclusions, is amended as follows:

    a.  The first sentence of the section is deleted in its entirety and the following is inserted:

        **We** shall not be liable for **Damages, Claims Expenses, Data Breach Team Expenses, Digital Property Replacement, Extra Expense, Income Loss,** or **Cyber Extortion Costs** on account of any **Claim**:

    b.  Exclusions 19, 20, and 21 are amended by deleting the phrase "**Digital Property Replacement**" and replaced with the phrase "**Digital Property Replacement** and Business Interruption Coverage"

5. Section V, Limits of Liability, Subsections 1, 2, and 4, are amended by deleting the phrase "**Cyber Extortion Costs**" and inserting the phrase "**Extra Expense, Income Loss, and Cyber Extortion Costs**";

6. Section VI, Retention, is amended by adding the following:

> With respect to the coverage afforded by this endorsement, **We** will pay the actual **Income Loss** and **Extra Expense** incurred by **You**:
>
> 1. once the **Waiting Period** shown in Item 1(d) of this endorsement has expired; and
>
> 2. which are in excess of the applicable Retention amount shown in Item 6 of the Declarations.
>
> All Retention amounts shall be computed as of the start of the **Interruption in Service**.

7. Section VIII, Other Insurance, is amended by deleting the phrase "**Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs** or **Digital Property Replacement**" wherever it appears and replacing it with the phrase "**Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs, Digital Property Replacement, Income Loss,** or **Extra Expense**"

8. Section XVIII, Definitions, is amended by adding the following definitions:

- **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

  1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

  2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

- **Extra Expense** means reasonable and necessary expenses incurred to mitigate, avoid or reduce an **Interruption in Service**, provided they are over and above expenses that **You** would have incurred had there been no **Interruption in Service**. **Extra Expense** shall also include any expenses incurred by **You** for the purpose of reducing the **Period of Restoration**, but solely to the extent such expenses are approved, in writing, by **Us** before they are incurred. **Extra Expense** does not include:

  1. costs of preventing a loss or correcting any deficiencies or problems with **Your Computer System** that might cause or contribute to a **Claim**; or

  2. penalties of any nature, however denominated, arising by contract.

- **Income Loss** means the net profit before taxes that **You** do not realize due to an **Interruption in Service**, including fixed charges incurred by **You** to the extent that such charges would have been incurred had there been no **Interruption in Service**. **Income Loss** shall be calculated on an hourly basis based on net profit and shall apply only to that time period during which **Your Computer System** is affected by an **Interruption in Service**.

- **Interruption in Service** means a detectable interruption or degradation in service or the failure of **Your Computer System** caused by a **Network Security Failure**.

- **Network Security Failure** means a failure in **Network Security** that in turn results in the alteration, corruption or destruction of **Digital Property** or an **Interruption of Service**.

- **Period of Restoration** means the continuous period of time that:

  1. begins with the earliest date of an **Interruption in Service**; and

  2. ends on the date when **Your Computer System** is or could have been repaired or restored with reasonable speed to the same functionality and level of service that existed prior to the **Interruption in Service**. In no event shall the **Period of Restoration** exceed thirty (30) days.

  **Period of Restoration** does not include any increases in the period of time defined above due to the enforcement of any law, ordinance or regulation or due to the actions of strikers or due to any loss of any licenses.

- **Waiting Period** means the number of hours specified in Item 1(d) of this endorsement.

9. Section XII, Territory and Valuation, is amended by deleting the phrase "**Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs or Digital Property Replacement**" wherever it appears and replacing it with the phrase "**Damages, Claims Expenses, Data Breach Team Expenses, Cyber Extortion Costs, Digital Property Replacement, Income Loss, or Extra Expense**"

10. Solely with respect to the coverage afforded by this endorsement, the following section is added:

- CAP ON LOSSES FROM **CERTIFIED ACTS OF TERRORISM**

  A. Cap on **Certified Acts of Terrorism** Losses

  If aggregate insured losses attributable to **Certified Acts of Terrorism** under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and **We** have met **Our** deductible under the Terrorism Risk Insurance Act, **We** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

  B. Application of Exclusions

  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this **Policy**.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative

## CHUBB

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

| Named Insured | | | | Endorsement Number |
|---|---|---|---|---|
| Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | | | | 4 |

| Policy Symbol | Policy Number | Policy Period | | Effective Date of Endorsement |
|---|---|---|---|---|
| EON | G28930392003 | 04/04/2019 to 04/04/2020 | | 04/04/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

### Payment Card Sublimit Endorsement

**This endorsement modifies insurance provided under the following:**

**Victor O. Schinnerer & Company Cyber Protection Package**

It is agreed that Section V, Limits of Liability, is amended to add the following:

Solely with regard to **Claims** arising out of **Payment Card Loss, Our** maximum aggregate limit of liability for all **Claims Expenses** and **Damages,** shall be $_____, each **Claim** and per **Policy Period** in the aggregate.  This sublimit of liability shall be part of and not in addition to the Limits of Liability otherwise stated in the Declarations, and will in no way serve to increase such limits;

All other terms and conditions of the policy remain unchanged.

_____

Authorized Representative

# CHUBB℠

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured | Endorsement Number |
|---|---|
| Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | 5 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| EON | G28930392003 | 04/04/2019 to 04/04/2020 | 04/04/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

### Regulatory Proceeding Sublimit

### This endorsement modifies insurance provided under the following:

### Victor O. Schinnerer & Company Cyber Protection Package

It is agreed that the **Policy** is amended as follows:

Section V, Limits of Liability, is amended to add the following:

Solely with regard to **Regulatory Proceeding Claims**, **Our** maximum aggregate limit of liability for all **Claim Expenses** and **Damages** shall be $250,000, each **Claim** and per **Policy Period** in the aggregate.  This sublimit of liability shall be part of and not in addition to the Limits of Liability otherwise stated in the Declarations, and will in no way serve to increase such limits.

The **Regulatory Proceeding** sublimit of Liability stated above shall not apply to that portion of **Damages** which are allocated to the **Consumer Redress Fund**.

All other terms and conditions of the policy remain unchanged.

_____

Authorized Representative

PF-46365 (06/15)                                                                        Page   1   of   1

# CHUBB

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | | | 6 |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| EON | G28930392003 | 04/04/2019 to 04/04/2020 | 04/04/2019 |

| Issued By (Name of Insurance Company) |
|---|
| Illinois Union Insurance Company |

## Cybercrime Endorsement

### This endorsement modifies insurance provided under the following:

### Victor O. Schinnerer & Company Cyber Protection Package

It is agreed that the **Policy** is amended as follows:

1. The Declarations are amended as follows:

    A. Item 5. is amended by adding the following:

    CYBERCRIME INSURING AGREEMENTS

    | | Each Loss | Insuring Agreement Aggregate |
    |---|---|---|
    | ☒ Electronic Transfer Fraud Limit of Liability | $250,000 | $250,000 |
    | ☒ Deceptive Transfer Limit of Liability | $250,000 | $250,000 |
    | ☒ Telephone Toll Fraud    Limit of Liability | $250,000 | $250,000 |

    Notwithstanding anything in these Declarations or the **Policy** to the contrary, the total limit of liability for all loss under these Cybercrime Insuring Agreements shall be          .

    B. Item 6. is amended by adding the following:

    | | |
    |---|---|
    | $15,000 | each loss, Electronic Transfer Fraud Insuring Agreement |
    | $25,000 | each loss, Deceptive Transfer Fraud Insuring Agreement |
    | $15,000 | each loss, Telephone Toll Fraud Insuring Agreement |

2. Section I, Coverage, is amended by adding the following:

    CYBERCRIME INSURING AGREEMENTS

    • Electronic Transfer Fraud

    **We** will pay for **Your** loss of **Funds** resulting directly from a **Fraudulent Electronic Instruction** directing a **Financial Institution** to transfer, pay or deliver **Funds** from **Your Account** which is discovered during the **Policy Period** and noticed to **Us** as set forth in this endorsement.

    **Fraudulent Electronic Instruction** means an instruction which purports to have been electronically

transmitted, submitted, or approved by **You**, but which was in fact fraudulently transmitted, submitted or approved by someone else without **Your** knowledge or consent.

- Deceptive Transfer Fraud

**We** will pay for **Your** loss of **Funds** resulting directly from **Your** having transferred, paid or delivered any **Funds** from **Your Account** as the direct result of an intentional misleading of **Your** employee, through a misrepresentation of a material fact ("**Deceptive Transfer**") which is:

1. relied upon by an employee, and
2. sent via a telephone call, email, text, instant message, social media related communication, or any other electronic instruction, including a phishing, spearphishing, social engineering, pretexting, diversion, or other confidence scheme, and,
3. sent by a person purporting to be an employee, customer, client or vendor; and,
4. the authenticity of such transfer request is verified in accordance with **Your** internal procedures.

if such loss is discovered during the **Policy Period** and noticed to **Us** as set forth in in this endorsement.

- Telephone Toll Fraud

**We** will pay for **Your** loss of **Funds** resulting directly from charges **You** incur for voice telephone long-distance toll calls which were incurred due to the fraudulent use or fraudulent manipulation of an **Account Code** or **System Password** required to obtain access to a **Voice Computer System** owned or leased by **You**, installed on **Your** premises, whose **System Administration** is performed and controlled by **You** ("**Telephone Toll Fraud**"); provided, however, that the unauthorized access was not made possible by:

1. failure to incorporate a **System Password** feature or failure to change the **System Password** at least once every 45 days thereafter, or
2. failure to have a call-disconnect feature in operation to automatically terminate a caller's access to the **Voice Computer System** after not more than three unsuccessful attempts to input an **Account Code**,

if such loss is discovered during the **Policy Period** and noticed to **Us** as set forth in this endorsement.

3. Solely with respect to the coverage afforded by this endorsement, Section III, Exclusions, is amended to add the following:

   a.   **We** shall not be liable for any loss resulting from:

   (i) any investment in **Securities**, or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine;
   (ii) the failure of any party to perform, in whole or in part, under any contract;
   (iii) the extension of any loan, credit or similar promise to pay;
   (iv) any party's use of or acceptance of any credit card, debit card or similar instrument, or any digital currency payments, whether or not genuine;
   (v) kidnap, ransom or any other extortion payment surrendered to any person as a result of a threat to do bodily harm to any person or a threat to do damage to any property;
   (vi) any person purporting to be a representative of any financial institution, asset manager, broker-dealer, armored motor vehicle company, or any similar entity;
   (vii) **Funds** while in the mail or in the custody of any carrier for hire, including but not limited to any armored motor vehicle company;
   (viii) the failure, malfunction, inadequacy or illegitimacy of any product or service;
   (ix) any **Other Property**; and,
   (x) any gambling, game of chance, lottery or similar game.

4.   Solely with respect to the coverage afforded by this endorsement, Section XVIII, Definitions, is amended to add the following:

a.   **Account** means an account maintained by **You** at a **Financial Institution** from which **You** can initiate the transfer, payment or delivery of **Funds**:

i.   by means of electronic, telegraphic, cable, teletype, telefacsimile or telephone instructions communicated directly through an electronic funds transfer system; or

ii.   by means of written instructions establishing the conditions under which such transfers are to be initiated by such **Financial Institution** through an electronic funds transfer system.

b.   **Account Code** means a confidential and protected string of characters which identifies or authenticates a person and permits that person to gain access to a **Voice Computer System** for the purpose of making toll calls or utilizing voice mail box messaging capabilities or other similar functional features of the **Voice Computer System**.

c.   **Financial Institution** means:

i.   a banking, savings or thrift institution; or

ii   a stock broker, mutual fund, liquid assets fund or similar institution at which **You** maintain an **Account**.

d.   **Funds** means **Money** and/or **Securities**.

e.   **Money** means:

i.   currency, bullion, coins and bank notes in current use and having a face value; and

ii.   Travelers checks, register checks and money orders held for sale to the public.

However, **Money** does not mean **Securities**.

f.   **Other Property** means any tangible property other than **Funds** that has intrinsic value. **Other Property** does not include computer programs, electronic data or any property specifically excluded under this **Policy**.

g.   **Securities** means negotiable and nonnegotiable instruments or contracts representing either **Money** or property including but not limited:

i.   stock certificates, tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use; and

i.   evidences of debt issued in connection with credit or charge cards, which cards are not issued by **You**;

but does not include **Money**.

h.   **System Administration** means the performance of security functions including but not limited to defining authorized persons to access a **Voice Computer System** and adding, changing and deleting **Account Codes** or passwords in connection therewith; and invoking or revoking a **Voice Computer System** option which directs telephone call routing or which adds, moves or drops telephone lines or which performs any other similar activity allowed by a hardware or software-based **Voice Computer System** option that has been incorporated by a manufacturer or vendor into a System or any component thereof provided said **Voice Computer System** option is not intended for the sole use of such manufacturer or vendor.

i.  **System Maintenance** means the performance of hard-ware and software installation, diagnostics and corrections and similar activities that are performed in the usual custom and practice by a manufacturer or vendor to establish or maintain the basic operational functionality of a **Voice Computer System** or any component thereof.

j.  **System Password** means a confidential and protected string of characters, which identifies or authenticates a person and permits that person to gain access to a **Voice Computer System** or any portion thereof for the purpose of performing **System Administration** or **System Maintenance** activities.

k.  **Voice Computer System** means a **Computer System** installed in one location which functions as a private branch exchange (PBX), voice mail processor, auto-mated call attendant or provides a similar capability used for the direction or routing of telephone calls in a voice communications network.

5.  Solely with regard to the coverage afforded by this endorsement, the following sections are added:

•   Notice

In the event of a loss, **You** must:

(i)   Notify **Us** as soon as possible. If **You** have reason to believe that any loss involves a violation of law, **You** must also notify the local law enforcement authorities.

(ii)  Submit to examination under oath at **Our** request and give **Us** a signed statement of the **Your** answers.

(iii) Produce for **Our** examination all pertinent records.

(iv)  Give **Us** a detailed, sworn proof of loss within 180 days.  **You** must include with **Your** proof of loss any instrument involved in that loss, or, if that is not possible, an affidavit setting forth the amount and cause of loss.

(v)   Cooperate with **Us** in the investigation and settlement of any claim.

6.  Cybercrime Limit of Liability

The most **We** will pay for each loss ("**Single Loss**") under any one Cybercrime Insuring Agreement ("**Single Loss Limit Of Liability**") will be the amount set forth in Item 5 of the Declarations.  The **Single Loss Limit Of Liability** shall be part of and not in addition to the applicable Cybercrime **Insuring Agreement Limit Of Liability**, the **Cybercrime Aggregate Limit Of Liability** and the Aggregate Limit Of Liability under this **Policy**.

For the purpose of the Cybercrime Insuring Agreements, a **Single Loss** means any and all loss resulting from **Interrelated Acts**.  For the purpose of the Cybercrime Insuring Agreements, **Interrelated Acts** means all acts, errors, omissions, events, incidents, facts, circumstances or situations resulting in a **Fraudulent Electronic Instruction, Deceptive Transfer** or **Telephone Toll Fraud** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes.

The most **We** will pay for all loss under each Cybercrime Insuring Agreement will be the amount set forth in Item 5 of the Declarations ('**Insuring Agreement Limit Of Liability**').  The **Insuring Agreement Limit Of Liability** shall be part of and not in addition to the **Cybercrime Aggregate Limit Of Liability** and the

Aggregate Limit Of Liability under this **Policy**.

The most **We** will pay for all loss for all Cybercrime Insuring Agreements will be the amount set forth in Item 5 of the Declarations ("**Cybercrime Aggregate Limit Of Liability**").  The **Cybercrime Aggregate Limit Of Liability** shall be part of and not in addition to the Aggregate Limit Of Liability under this **Policy**.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Representative

CHUBB

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC | | | 7 |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| EON | G28930392003 | 04/04/2019 to 04/04/2020 | 04/04/2019 |
| Issued By (Name of Insurance Company) | | | |
| Illinois Union Insurance Company | | | |

### Other Insurance Amended – Primary Insurance for Data Breach Team Expenses
#### This endorsement modifies insurance provided under the following:
#### Victor O. Schinnerer & Company Cyber Protection Package

It is agreed that Section VIII, Other Insurance, is deleted in its entirety and replaced with the following:

VIII.    OTHER INSURANCE

If any **Damages, Claims Expenses, Cyber Extortion Costs, Digital Property Replacement, Income Loss,** or **Extra Expense** covered under this **Policy** are covered under any other valid and collectible insurance, then this **Policy** shall cover such **Damages, Claims Expenses, Cyber Extortion Costs, Digital Property Replacement, Income Loss,** or **Extra Expense**, subject to the **Policy** terms and conditions, only to the extent that the amount of such **Damages, Claims Expenses, Cyber Extortion Costs, Digital Property Replacement, Income Loss,** or **Extra Expense** are in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limits of Liability provided by this **Policy**.

Notwithstanding anything to the contrary, if any **Data Breach Team Expenses** covered under this **Policy** are also covered under any other valid and collectible insurance, then this **Policy** shall cover such **Data Breach Team Expenses**, subject to the **Policy** terms and conditions, on a primary basis, whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise.

All other terms and conditions of the policy remain unchanged.

_____

Authorized Representative

# Exhibit B

Illinois Union Insurance Company    O +908.605.3085
82 Hopmeadow St., PO Box 2002       Nina.Friel@Chubb.com
Simsbury, CT 06070-7683

December 24, 2019

**VIA CERTIFIED AND REGULAR MAIL**

CHUBB

Shera Hunter
Star Title Partners of Palm Harbor, LLC &
Star Title Partners of Tampa, LLC
3450 Buschwood Park Dr.
Tampa, FL 33618

| | | | |
|---|---|---|---|
| Re: | Insured | : | Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC |
| | Policy No. | : | G28930392 |
| | Policy Type | : | Victor O. Schinnerer & Company Cyber Protection Package – Cybercrime Endorsement |
| | Company | : | Illinois Union Insurance Company |
| | Claim No. | : | KY19K2781801 |
| | Matter | : | Capital Mortgage Services |

Dear Ms. Hunter:

Illinois Union Insurance Company writes Victor O. Schinnerer & Company Cyber Protection Package policy no. G28930392 (the "Policy) for Star Title Partners of Palm Harbor, LLC & Star Title Partners of Tampa, LLC ("Star Title Partners"). Illinois Union Insurance Company has determined that coverage is not afforded for this loss under the Cybercrime Endorsement of the Policy and respectfully denies coverage for the reasons set forth herein.

We understand the facts to be as follows: Star Title Partners is a title company, and Capital Mortgage Services of Texas is a mortgage company. On August 1, 2019, Neil Woods and Barbara Woods signed an agreement confirming Star Title Partners as the settlement agent for the sale of their home. On the same day, Star Title Partners emailed Capital Mortgage Services of Texas, indicating that Star Title Partners had been retained by the Woodses on the closing and requesting that Capital Mortgage Services of Texas send a payoff statement to Star Title Partners.

On August 6, 2019, Star Title Partners received an email purportedly from Kaitlyn Holt of Capital Mortgage Services of Texas.[1] The email sent by the purported Kaitlyn Holt included a payoff statement, which listed a Sun Trust bank account as the recipient for the payoff funds. On August 9, 2019, Star Title Partners wired $180,902.31 to the Sun Trust account listed in the payoff statement from the purported Kaitlyn Holt. On October 23, 2019,

---

[1] The email sent by the purported Kaitlyn Holt was sent from the email address "Kaitlyn@capitalmortg.com". We understand that the correct email address domain for Capital Mortgage Services of Texas is "@capitalmort.com".

1

Star Title Partners discovered that Capital Mortgage Services of Texas had never received the August 9 payment.

Illinois Union Insurance Company wrote the Policy for the policy period of April 4, 2019 to April 4, 2020.  This letter is limited solely to a review of the Cybercrime Endorsement of the Policy.  The Cybercrime Endorsement of the Policy includes the Deceptive Transfer Fraud Insuring Agreement, subject to a $250,000 limit of liability and a $25,000 retention.

We direct your attention to the following provisions of the Cybercrime Endorsement:

    It is agreed that the Policy is amended as follows:

    2. Section I, Coverage, is amended by adding the following:

    CYBERCRIME INSURING AGREEMENTS

- Deceptive Transfer Fraud

**We** will pay for **Your** loss of **Funds** resulting directly from **Your** having transferred, paid or delivered any **Funds** from **Your Account** as the direct result of an intentional misleading of **Your** employee, through a misrepresentation of a material fact ("**Deceptive Transfer**") which is:

1. relied upon by an employee, and
2. sent via a telephone call, email, text, instant message, social media related communication, or any other electronic instruction, including a phishing, spearphishing, social engineering, pretexting, diversion, or other confidence scheme, and,
3. sent by a person purporting to be an employee, customer, client or vendor; and,
4. the authenticity of such transfer request is verified in accordance with **Your** internal procedures.

if such loss is discovered during the **Policy Period** and noticed to **Us** as set forth in this endorsement.

3. Solely with respect to the coverage afforded by this endorsement, Section III, Exclusions, is amended to add the following:

    a.     **We** shall not be liable for any loss resulting from:

        (vi) any person purporting to be a representative of any financial institution, asset manager, broker-dealer, armored motor vehicle company, or any similar entity;

4. Solely with respect to the coverage afforded by this endorsement, Section XVIII, Definitions, is amended to add the following:

    d. **Funds** means **Money** and/or **Securities**.

e. **Money** means:

> i. currency, bullion, coins and bank notes in current use and having a face value; and
> ii. Travelers checks, register checks and money orders held for sale to the public.

However, **Money** does not mean **Securities**.

In this matter, there is no coverage under the Deceptive Transfer Fraud Insuring Agreement. The loss in this matter resulted from Star Title Partners wiring $180,902.31 according to the payoff statement sent by the fraudster on August 6. It is our understanding based upon the information provided that the fraudster in this matter was purporting to be Kaitlyn Holt of Capital Mortgage Services of Texas. Section (vi) of paragraph a. of Section 3. of the Cybercrime Endorsement excludes coverage for loss resulting from any person purporting to be a representative of any financial institution, asset manager, broker-dealer, armored motor vehicle company, or any similar entity. Capital Mortgage Services of Texas is a mortgage company, and as such is a financial institution or similar entity. Accordingly, there is no coverage under the Deceptive Transfer Fraud Insuring Agreement.

Based on the above, we respectfully deny coverage under the Cybercrime Endorsement of the Policy. If you disagree with our analysis or have additional information you wish us to consider, please provide us with such information in writing and we will take same under consideration subject to a reservation of rights.

Please understand that Illinois Union Insurance Company's position with respect to this matter is based upon the information provided to date. This letter is not intended to waive any rights or defenses of Illinois Union Insurance Company which it may now or in the future have and which may hereafter accrue by reason of the terms and conditions of the above captioned policy of insurance, or otherwise. All of Illinois Union Insurance Company's rights and defenses are specifically reserved. If you have any questions regarding this matter, please do not hesitate to contact me.

Very truly yours,

Nina Friel, Esquire
Claims Specialist, Fidelity Claims
North America Financial Lines

150 Allen Road, Suite 101, Basking Ridge, NJ  07920  USA
O 908-605-3085
E Nina.Friel@Chubb.com

**VIA CERTIFIED AND REGULAR MAIL**

Paul M. Bondy
President
PBI Group
23114 Expedition Drive
Ashburn, VA 20148

3