UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

STAR TITLE PARTNERS OF PALM
HARBOR, LLC, a Florida limited liability
company,

    Plaintiff,

v.                                                                                                  Case No: 8:20-cv-2155-JSM-AAS

ILLINOIS UNION INSURANCE
COMPANY, an Illinois corporation,

    Defendant.

_____

## ORDER

THIS CAUSE comes before this Court upon Plaintiff's Motion for Partial Summary Judgment (Dkt. 16) and Defendant's Cross-Motion for Summary Judgment (Dkt. 19). The Court, having reviewed the motions, responses, replies, record evidence, and being otherwise advised in the premises concludes that Plaintiff's motion should be denied and Defendant's motion should be granted. The Court agrees with Defendant that there is no coverage for Plaintiff's loss associated with the fraudulent wire transfer instructions under the plain language of the subject insurance policy. Accordingly, final judgment will be entered in Defendant's favor.

## BACKGROUND

Plaintiff Star Title Partners of Palm Harbor, LLC, a settlement agent hired to close a residential real estate transaction, seeks insurance coverage from Defendant Illinois Union Insurance Company on the theory that an unidentified threat actor fraudulently

induced Star Title to wire funds to the incorrect account by impersonating a mortgage lender, Capital Mortgage Services of Texas ("CMS"). The following facts are undisputed.

Star Title is a title company located in Palm Harbor, Florida. On or about August 1, 2019, Neil Woods retained Star Title to act as the settlement agent for the sale of his home located in Florida. As settlement agent, Star Title's duties included receipt and distribution of the sale proceeds. Star Title generally assigns two representatives for each closing: a processor and a closer. The processor clears title for the property, while the closer distributes funds at the time of closing. With respect to the sale of Woods' home, Star Title assigned Dee Osborne as the processor and Kathy Wellington as the closer.

Woods executed a seller information form that identified CMS as his lender and a lienholder on the property. After CMS confirmed its lien, Osborne requested payoff information from CMS. On August 1, 2019, Osborne contacted CMS at the phone number provided by the seller to request payoff information. She spoke with a representative of CMS and was told to submit her request via email to payoffs@capitalmort.com. As instructed, Osborne sent an email to payoffs@capitalmort.com requesting a "Mortgage Loan Payoff Letter" in anticipation of the closing scheduled for August 9, 2019. For identification purposes, Osborne provided the name of the sellers/mortgagors, the address of the property, the loan number, and the closing date. She also attached a copy of the sellers' authorization form.

In response, Osborne received an email purportedly sent by "Kaitlyn Holt, Payoff Representative." Osborne reviewed the email and verified that it correctly referenced the

2

name of the sellers/mortgagors, the loan number, and the closing date. A copy of the Payoff Statement was attached to the email, which also contained instructions for the transfer of payoff funds. Osborne reviewed the Payoff Statement and verified that it was generated by CMS, that it correctly identified the sellers/mortgagors, the loan number, and the property address. She also verified that the payoff amount was consistent with the amount the sellers had represented.

That same day, Star Title received a second copy of the Payoff Statement sent via facsimile purportedly "From: Capital Mortgage of Texas." Osborne reviewed the faxed copy of the Payoff Statement and verified that it matched the copy sent via email. Thereafter, the amount listed on the Payoff Statement was included in the sellers' debit column of the Final ALTA Settlement Statement, which was presented to the buyers and sellers at closing.

According to Osborne, she was aware that online banking fraud was on the rise in the real estate industry. As such, she was always on the lookout for red flags or indicators of possible fraud. Osborne did not notice any red flags or suspicious circumstances associated with the transaction, so she determined that the Payoff Statement was authentic and that no additional steps were required to verify the authenticity of the Payoff Statement. It is undisputed that Osborne did not communicate with Kaitlyn Holt or any other CMS representative to verify the authenticity of the wire information. It is also undisputed that Osborne is the only person that received the August 6 email and facsimile, and once she

received this information, she simply printed copies of the information and placed them in the paper file that would be given to Wellington at the time of closing.

The closing took place as scheduled on August 9, 2019, and Osborne initiated the transfer of payoff funds from Star Title's escrow account pursuant to the instructions on the Payoff Statement. That same day, Wellington approved the wire transfer in accordance with Star Title's two-person authentication protocol, which required Wellington to review the wire information to confirm that it matched the information in the paper file. Because the information matched, Wellington approved the wire transfer in the amount of $180,902.31 to the referenced Sun Trust Bank account. It is undisputed that Wellington did not communicate with Kaitlyn Holt or any other CMS representative to verify the authenticity of the wire information.

After an internal investigation, Star Title determined that the wire instructions received by Ms. Osborne on August 6, 2019, were fraudulent. Star Title then tendered its claim to Illinois Union pursuant to a Cyber Protection Package Policy with effective dates of April 4, 2019, to April 4, 2020 (the "Policy"). The Policy includes a Cybercrime Endorsement, which provides coverage for Deceptive Transfer Fraud subject to a $250,000 limit of liability and a $25,000 retention.

On or about December 24, 2019, Illinois Union denied coverage under the Policy. On July 27, 2020, Star Title filed a breach of contract action against Illinois Union in Florida state court. Star Title alleged Illinois Union breached the terms of the Policy because it wrongfully denied coverage for Star Title's financial loss resulting from a loss

4

of funds as a result of a "Deceptive Transfer" as defined in the Policy. Illinois Union removed the action to this Court based on diversity jurisdiction.

Now, Star Title moves for partial summary judgment and Illinois Union moves for summary judgment on the entirety of the complaint. As discussed below, the Court agrees with Illinois Union that there is no coverage under the subject policy for two reasons: (1) the fraudster did not "purport to be an employee, customer, client or vendor"; and (2) "the authenticity of [the] transfer request [was not] verified in accordance with [Star Title's] internal procedures." Notably, each reason, standing alone, entitles Illinois Union to judgment in its favor.

## SUMMARY JUDGMENT STANDARD

Motions for summary judgment should be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248–49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379, 1383 (11th Cir.1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## **DISCUSSION**

**I.      Relevant Law**

Under Florida law, insurance contracts must be construed according to their plain meaning. *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.,* 913 So. 2d 528, 532 (Fla. 2005). And "like other contracts, contracts of insurance should receive a construction that is reasonable, practical, sensible, and just." *State Farm Mut. Auto. Ins. Co. v. Mashburn*, 15 So. 3d 701, 704 (Fla. Dist. Ct. App. 2009). "[I]n

6

construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." *Id.* "In other words, a single policy provision should not be read in isolation and out of context, for the contract is to be construed according to its entire terms, as set forth in the policy and amplified by the policy application, endorsements, or riders." *Id.*

"The terms of an insurance policy should be taken and understood in their ordinary sense and the policy should receive a reasonable, practical and sensible interpretation consistent with the intent of the parties—not a strained, forced or unrealistic construction." *Ducksbury v. Progressive Express Ins. Co.*, 211 So. 3d 73, 75 (Fla. Dist. Ct. App. 2017). "If one interpretation, viewed with the other provisions of the contract and its general object and scope, would lead to an absurd conclusion, that interpretation must be abandoned and one more consistent with reason and probability adopted." *Travelers Indem. Co. v. Milgen Dev., Inc.*, 297 So. 2d 845, 847 (Fla. Dist. Ct. App. 1974); *accord AAA Life Ins. Co. v. Nicolas*, 603 So. 2d 622, 624 (Fla. Dist. Ct. App. 1992).

However, if the policy language is susceptible to two reasonable interpretations—one providing coverage, the other limiting coverage—the policy is ambiguous. *Flores v. Allstate Ins. Co.*, 819 So. 2d 740, 744 (Fla. 2002). Ambiguous policy provisions are construed in favor of coverage and against the insurer. *Id.* "When a term in an insurance policy is undefined, it should be given its plain and ordinary meaning, and courts may look to legal and non-legal dictionary definitions to determine such a meaning." *Botee v. S. Fid. Ins. Co.*, 162 So. 3d 183, 186 (Fla. Dist. Ct. App. 2015).

"A provision is not ambiguous simply because it is complex or requires analysis." *Garcia v. Fed. Ins. Co.*, 969 So. 2d 288, 291 (Fla. 2007). "[C]ourts construe undefined policy terms according to the meaning a person of ordinary intelligence would reasonably give it." *Owners Ins. Co. v. Berke*, 6:17-cv11505-Orl-37TBS, 2018 WL 3850005, at *2 (M.D. Fla. Aug. 1, 2018).

## II.   Analysis

Star Title tendered its claim under the Cybercrime Endorsement to the Policy. That endorsement includes a Deceptive Transfer Fraud insuring clause, the clause at issue in this case, which states, in relevant part:

> **We** will pay for **Your** loss of **Funds** resulting directly from **Your** having transferred, paid or delivered any **Funds** from **Your Account** as the direct result of an intentional misleading of **Your** employee, through a misrepresentation of a material fact **("Deceptive Transfer")** which is:
> 1. relied upon by an employee, and
> 2. sent via a telephone call, email, text, instant message, social media related communication, or any other electronic instruction, including a phishing, spearphishing, social engineering, pretexting, diversion, or other confidence scheme, and,
> 3. sent by a person purporting to be an employee, customer, client or vendor; and,
> 4. the authenticity of such transfer request is verified in accordance with **Your** internal procedures.
>
> if such loss is discovered during the **Policy Period** and noticed to **Us** as set forth in in this endorsement.

(Dkt. 19 at Ex. G, End. 6).

As delineated above, the subject policy requires Star Title to prove that (1) the perpetrator "purport[ed] to be an employee, customer, client or vendor"; and (2) "the authenticity of such transfer request [was] verified in accordance with [Star Title's] internal procedures." The undisputed facts demonstrate that Star Title cannot establish either of

8

these coverage requirements because CMS was not Star Title's employee, customer, client or vendor and Star Title made no attempt to verify the authenticity of the August 6 transfer request.

Beginning with the first requirement, although the terms "employee, customer, client or vendor" are undefined in the Policy, Illinois Union is correct that this does not render the Policy ambiguous because these are commonplace terms easily defined through a dictionary. Indeed, when construing undefined terms, Florida courts routinely adopt the plain meaning of the words contained in legal and non-legal dictionaries. *Admiral Ins. Co. v. Spira*, No. 608CV1772ORL22DAB, 2010 WL 11507122, at *3 (M.D. Fla. Mar. 31, 2010) ("When construing the plain meaning of phrases in an insurance contract, Florida courts may consult references commonly relied upon to supply the accepted meanings of words"). Merriam-Webster defines the terms as follows:

- Employee means "one employed by another usually for wages or salary and in a position below the executive level."
- Customer means "one that purchases a commodity or service."
- Client means "a person who engages the professional advice or services of another."
- Vendor means "one that vends: seller."

(Dkt. 19 at 9-10) (citing to Merriam-Webster and case law utilizing these definitions).

It is clear from the record that CMS does not qualify as Star Title's employee, customer, or client because Star Title did not employ anyone from CMS and had no

9

contract or agreement with CMS. It is also clear that Star Title did not provide goods or services to CMS and did not receive any goods or services from CMS. Moreover, CMS does not qualify as a vendor because CMS did not sell a product or a service to Star Title. CMS is a mortgage bank that originates and services loans, not a seller of goods or services. Notably, CMS's Chief Executive Officer swore under oath that CMS was not Star Title's customer, client or vendor.

Unable to dispute the facts or dictionary definitions, Star Title urges the Court to re-write the Policy to include any "persons and entities involved in the real estate transaction," which would include CMS, the recipient of the payoff funds. (Dkt. 23 at 11). However, the Policy is not written so broadly and the Court cannot disregard the plain meaning of the terms "employee, customer, client or vendor…" *Taurus Holdings, Inc. v. USF&G*, 913 So. 2d 528, 537 (Fla. 2005) (court may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties"). Accordingly, Illinois Union is entitled to judgment because there is no coverage under the undisputed facts of this case.

Turning to the second requirement at issue, the Policy requires that "the authenticity of such transfer request is verified in accordance with Your internal procedures." Illinois Union is entitled to judgment because Star Title made no attempt to verify the authenticity of CMS's alleged wire transfer instructions pursuant to Star Title's internal procedures. While the record is unclear about Star Title's internal procedures when receiving wire transfer instructions, it is undisputed that Star Title represented in its application during the underwriting process that it verbally authenticated wire instructions. (Dkt. 19-8 at 2). It

is also undisputed that Star Title failed to verbally authenticate the wire instructions here. (Dkt. 19-8 at 2). Kaitlyn Holt, the CMS employee who allegedly sent the wire instructions, stated in her affidavit that she was unaware of any attempt on Star Title's part to verify the wire instructions. Star Title's own investigation confirmed the failure to make any attempt to authenticate CMS's alleged wire transfer instructions: "When we found out that the wire had been hacked, I had asked her if there was any communication at all and she told me, no, there was not." (Hunter Dep. 26:12-26:14; see also 41:18- 42:2; 55:11-56:14; 57:19-59:5; 61:12-21).

Notably, Star Title's practice of segregating the closing process did not include any steps designed to verify the authenticity of the wire transfer instructions. Instead, one employee filed the incoming instructions (without verifying their authenticity), while a second employee compared the final direction to the bank to the unverified instructions (again without verifying their authenticity). This does not comply with the clear language of the Policy. Accordingly, Star Title did not authenticate the transfer pursuant to its represented procedures and cannot establish a loss covered under the Policy.

It is therefore ORDERED AND ADJUDGED that:

1. Plaintiff's Motion for Partial Summary Judgment (Dkt. 16) is denied.
2. Defendant's Cross-Motion for Summary Judgment (Dkt. 19) is granted to the extent discussed herein.
3. The Clerk of Court is directed to enter Final Judgment in favor of Defendant and against Plaintiff.

4. The Clerk of Court is further directed to close this case and terminate any pending motions as moot.

**DONE** and **ORDERED** in Tampa, Florida, this September 1, 2021.

_____
JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record